GEORGE P. WEDDLE AND BERTHA R. (TERRIS) WEDDLE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 87431. Filed November 30, 1962.

*Abraham D. Slavitt, Esq.*, for the petitioners.
*Lawrence A. Wright, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined a deficiency in petitioners' income tax for the calendar year 1955 in the amount of $9,865.69.

One of the issues has been conceded. The only issue before us is whether petitioner may deduct a loss incurred during 1955 as a business or nonbusiness bad debt.

#### FINDINGS OF FACT.

Petitioners, George P. and Bertha R. (Terris) Weddle, are husband and wife and during the taxable year involved herein, 1955, lived in East Norwalk, Connecticut. Petitioners filed their joint Federal income tax return for the taxable year 1955 with the district director of internal revenue for the district of Connecticut. Inasmuch as George is a party to this proceeding only because of the filing of a joint return and the transaction in issue relates only to Bertha, she will hereinafter be referred to as petitioner.

In 1933 Arthur Terris and Louis Terris formed a corporation under the laws of the State of New York to manufacture and sell ladies' lingerie, and transferred all the assets and liabilities of their partnership to the corporation, known as Terris Brothers, Inc. (hereinafter referred to as the Company), each of the brothers receiving 50 percent of the 500 shares of the capital stock of the company.

After Louis died in 1943, his stock was purchased by the company from his estate, leaving Arthur holding all of the outstanding stock of the company.

When Arthur died in 1945, he bequeathed 60 percent of such stock to his widow, Bertha, the petitioner herein, and 20 percent to each of his two daughters.

In Schedule B of the Federal estate tax return filed for Arthur's estate, the 250 shares of stock of Terris Brothers, Inc., was valued at $205,000.

The company's book net worth (capital plus earned surplus) totaled $337,220.01 and $204,598.33 as of December 31, 1950, and December 31, 1951, respectively.

From the date of the death of Arthur, petitioner, who had previously been a housewife, operated the business of the company as president and general manager, devoting her full time to the company. She received a yearly salary of $25,000 during the years 1945 through 1949; $20,000 for 1950, and $18,560 in 1951, and about $17,000 for the years 1952 through 1954. This salary comprised the bulk of petitioner's income during these years.

In 1951 the company purchased from one of the daughters her 20 percent share of the capital stock, leaving petitioner owning 75 percent of the stock and her other daughter, 25 percent of the stock in the company.

In March of 1951, it became necessary for the company to obtain a line of credit from a bank.

Pursuant to the bank's requirement, petitioner personally endorsed and guaranteed all of the company's loans. In addition, the bank insisted that all loans made during a year must be paid in December of that year, or, at the latest, by the end of January of the following year. Payment was made by the corporation on the loans made during 1951 and 1952.

All of the loans made during the year 1953 could not be paid by the company by the end of January 1954, and in March 1954, when the outstanding indebtedness was $85,000 and the financial condition of the corporation was precarious, the bank insisted that petitioner, as the endorser, liquidate such debt or collateralize the loan with marketable securities. In order to continue the business for the balance of the season, the taxpayer put up, as collateral, stock registered in her name at a market value of more than sufficient to meet the indebtedness to the satisfaction of the banking institution.

The company continued to make partial payments on the bank indebtedness until the balance, in September 1954, totaled $59,945.58.

At such time it became apparent that the financial condition of the company, instead of improving, was getting worse, and petitioner, as an officer and director of the company, entered into an agreement assigning the company's assets to trustees for the benefit of creditors.

From the liquidation of the corporation, the bank realized $25,753.94, resulting in an unsatisfied balance of $34,191.64. Demand was thereupon made on the petitioner for the unpaid balance pursuant to her guarantee, and she paid the requisite amount of $34,191.64 to the bank.

In addition to the above venture, petitioner, beginning in 1951, assumed on a salary basis, the operation and management of Samuel Roodner, Inc., a real estate corporation whose controlling shares she inherited from her father.

On her Federal joint income tax return for the taxable year 1955 petitioner deducted the full amount she paid to the bank pursuant to

her personal endorsement of the company's notes of $34,191.64 as a "loss" with the explanation that such amount "was a total, definite and complete loss to her and a proper deduction, from her ordinary income for the calendar year 1955."

Respondent determined that the "deduction in the amount of $34,191.64 claimed for a loss arising from the guarantee of a corporate indebtedness should be disallowed inasmuch as the transaction is held to have resulted in a nonbusiness bad debt, deductible only as a short-term capital loss under the provisions of section 166 (d) of the Internal Revenue Code of 1954."

Petitioner during the years in issue was engaged in the trade or business of being a president and general manager of the company.

The endorsement of the company's notes was not proximately related to such trade or business.

#### OPINION.

The parties agree that a valid debt was created between petitioner and the company in the amount of $34,191.64, upon payment of such sum by petitioner to the bank pursuant to petitioner's personal guarantee of the company's notes, *Putnam* v. *Commissioner*, 352 U.S. 82 (1957), and that such debt became worthless in 1955. The only issue which they have placed before this Court is whether petitioner may deduct the loss on such debt as a business bad debt or nonbusiness bad debt, within the meaning of section 166 (d) (2).[1]

Respondent argues on brief that petitioner was not entitled to a business bad debt deduction because she was "not in the money lending business," or in the "business of organizing, promoting, financing, and mortgaging corporations so extensively as to elevate that activity to the status of a separate business," that a taxpayer should not be considered to be engaged in a business of his own merely because he advances money on behalf of a corporation of which he is an officer and substantial stockholder, and that the business of a corporation is not the business of its stockholders or employees.

While we agree with the above statements of law and fact, we do not accept them as finally dispositive of the issue before us.

The code, in its definition of what is not a nonbusiness bad debt inferentially provides two requirements: (1) That the taxpayer be

---

[1] SEC. 166. BAD DEBTS.

(d) NONBUSINESS DEBTS.—

\* \* \* \* \* \* \*

(2) NONBUSINESS DEBT DEFINED.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer ; or

(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

engaged in a trade or business and that (2) the debt be incurred in connection with and proximately related to such trade or business.

It is true that the business of the company was not the business of petitioner; that the company was in no sense her alter ego; and that business expenses or losses of the company would in no sense be the business expenses or losses of petitioner. This does not, of itself, however, mean that we must further hold that petitioner herself was not carrying on a trade or business. Petitioner held the position of president and general manager of the company from 1945 through 1955 and her duties and responsibilities in that position occupied most of her time, attention, and services for which she received a substantial salary. We believe that petitioner during this time was carrying on a trade or business of being the president and general manager of the company within the meaning of the statute. See *Van Pelt* v. *Commissioner*, 191 F. 2d 861 (C.A. 6, 1951), affirming per curiam a Memorandum Opinion of this Court; *W. A. Dallmeyer*, 14 T.C. 1282, 1289 (1950).

To say that petitioner during these years had no "trade or business" because the business of the company was not that of the petitioner would be to fail to recognize that petitioner was doing something besides passively holding her stock. Petitioner might have employed someone else to manage her affairs, but she, in fact, attended to them herself.

Nevertheless, to qualify as a business bad debt deduction, any loans which petitioner made during the years in issue must have been proximately related to and in connection with her trade or business. This brings us to the further question of whether such debts were in fact so related to her trade or business.

During the years in issue, petitioner wore two hats, one as president and general manager of the company for which she received a substantial salary, and two as a major shareholder of a corporation with her daughter owning the remaining stock. The question which we have before us is to determine what hat petitioner wore the day she endorsed the corporate notes which she subsequently was called upon to partially pay.

Petitioner's pertinent testimony concerning her endorsement of the company's notes is as follows:

Q. So when you borrowed money for the corporation, it was on a corporation note which they required you to endorse, is that right?
A. That is correct.
Q. Would they give it to the corporation without your endorsement?
A. No.
Q. Because?
A. Because I was the president of the corporation and the only active person in the corporation. It was my corporation with my two children.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. Yes, if the bank would not loan the money to the corporation without your endorsement, and you wouldn't endorse, what would have happened to the business?

A. I am afraid the business would have just folded up. We wouldn't have been able to liquidate.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. Now you testified, I believe, that you guaranteed these notes because you were required to as president of the corporation, is that true?

A. I imagine I wanted the business to keep going.

Q. Why did the bank require an endorsement on the notes?

A. Well, because I was president of the corporation and active in the corporation. They wouldn't grant you a loan without an endorsement.

Q. Why not?

A. Why not? Well, I would think as owner of the business, practically owner of the business, it was up to me to guarantee the security of their loan.

The above testimony, we believe, not only fails to prove that the endorsement was primarily because of her position as president and manager of the company, but tends rather to prove that petitioner endorsed the notes as controlling shareholder and "practically owner" of the corporation. In any event, though bearing the burden of proof, petitioner has failed to establish that the debt in question was proximately related to her trade or business of being president and general manager rather than her status of controlling stockholder and practical owner of a substantial business. Inasmuch as such status does not amount to a trade or business, debts proximately related to such position, or in other words, debts to protect one's investment, cannot be deemed business debts. *Burnet* v. *Clark*, 287 U.S. 410 (1932) ; *Dalton* v. *Bowers*, 287 U.S. 404 (1932). See also *Estate of Dominick F. Pachella*, 37 T.C. 347, 352 (1961).

It is to be noted that the company's book net worth as of the end of 1950 and 1951 totaled $337,222.01 and $204,598.33, respectively. If the actual value of the business was, in fact, less in those years, petitioner has failed to establish such value. The record does not disclose the book net worth (or value) of the business as of the end of 1952. We have no reason to believe, however, that petitioner's desire to protect her investment in the business was any different in 1953 than it was in prior years, or that her endorsement of company notes was due to any different motive. In any event, petitioner has failed to show that her interest was not still substantial.

Petitioner strongly relies upon *Trent* v. *Commissioner*, 291 F. 2d 669 (C.A. 2, 1961), reversing 34 T.C. 910 (1960).

In the *Trent* case, the taxpayer, was required to buy one-third of the capital stock of his employer for $5,000 and, as a condition to his employment, was required to periodically advance sums to the corporation until it became financially sound. Pursuant to such condition, taxpayer advanced in excess of $9,000 to the company and when he

refused to make further advances, he was discharged. It was there held that, inasmuch as the loans were shown to be one of the obligations of his position, and they were made to retain his employment rather than to protect his investment, such loans were proximately related to his business of being an employee and, therefore, constituted business debts.

We believe the mere statement of the facts in the *Trent* case shows its inapplicability to the instant case. Unlike *Trent*, petitioner was the controlling shareholder who could determine the extent of her duties and was not subject to being discharged by the corporation. Unlike the petitioner, Trent proved that he was motivated by his desire to maintain his position with the company as an employee rather than because of his comparatively small investment. His loans were part of his employment agreement, and, as stated above, when he eventually refused to make further loans, he was dismissed. In the instant case, petitioner's interest as stockholder was substantial. We have little doubt that Trent may have been somewhat motivated by his desire to protect his investment, just as we believe that petitioner may have been somewhat motivated by her desire to maintain the company in order to keep her well salaried position. In the absence, however, of scales sufficiently sensitive to be able to ascertain the exact percentage of motivations which impelled their respective actions, we look to the main and dominant reason for their actions. In the instant case, petitioner has failed to establish that her dominant reason was to continue her business of being president and general manager rather than to protect her investment.

Petitioner also relies on *Maytag* v. *United States*, 289 F. 2d 647 (1961) (348–57 Ct. Cl. 1961), where it was stated at pages 649–650:

The plaintiff, for reasons satisfactory to him, carried on these enterprises in corporate form. He was not involved in these corporations merely as an investor. He worked in them, made the important decisions in them, put up the money to enable them to operate. The plaintiff was a very busy man, and what he was busy at was the activities of these enterprises. They were all within the same general field, that of aviation. If he had carried on all these activities as an individual proprietor, as indeed he did carry on most of them for several years, he could without question have included the successes and failures of all the separate branches of his business in his computation of his income. Our conclusion is that these activities were his business, and that the bad debt which he seeks to deduct was a business bad debt.

\* \* \* \* \* \* \*

\* \* \* Of course one is not engaged in a business simply because he has invested money in it for the purpose of making a profit, and if he lends money to it in an attempt to protect his investment, and loses the money, he has not lost the money in the business in which he is engaged.

\* \* \* \* \* \* \*

\* \* \* No one could say, in reason, that the plaintiff was not engaged in business. But he did nothing other than manage and work in his corporations. It would seem to follow that the management and work was the business in which he was engaged, since that was the only thing he did. It would be hard to imagine a loss more "proximate" to that business activity than the uncollectibility of a loan made to it to promote its well-being.

What the Government urges, as we see it, is that if one embodies his business in the corporate forms, he may *in fact* spend his days in overalls working at a bench in his factory, but *in law* he will be regarded as engaged only in cashing dividend checks and clipping coupons. We see no reason to engage in such make-believe. If the lawmakers had intended to draw the line at the corporate form of business, they would have said so. If they had said anything susceptible of being interpreted to mean that, the Treasury in its regulations would have said so.

Insofar as this decision holds that the business of a corporation is that of its active major shareholder, we believe it to be contrary to *Burnet* v. *Clark*, 287 U.S. 410 (1932), where it was stated at page 415:

The respondent was employed as an officer of the corporation; the business which he conducted for it was not his own. There were other stockholders. And in no sense can the corporation be regarded as his *alter ego,* or agent. \* \* \*

On the other hand, insofar as the *Maytag* case holds that an advance by an employee-shareholder to his corporation "to protect its well-being" is proximately related to the trade or business of being an employee of a corporation, we cannot agree. While it is true that an employee-shareholder will indirectly benefit from the corporation's "well-being" since he would lose his position if the corporation closed its doors, we believe that such indirect benefit, without more, is insufficient to cause an advance to be proximately related to his trade or business of being an employee.

Petitioner used her credit and advanced sums on behalf of the company in an effort to promote the well-being of the company and to protect her substantial interest in the company. These actions were not proximately related to her trade or business of being an officer or employee.

*Decision will be entered under Rule 50.*