Leonard Lundgren and Evelyn R. Lundgren v. Commissioner.
Lundgren v. Commissioner
Docket No. 5705-63.
United States Tax Court
T.C. Memo 1965-314; 1965 Tax Ct. Memo LEXIS 16; 24 T.C.M. (CCH) 1753; T.C.M. (RIA) 65314; December 7, 1965
William H. Kinsey, 12th Floor, Standard Plaza, Portland, Ore., for the petitioners. Richard Rink, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined a deficiency in petitioners' income tax for the taxable *17 year 1961 in the amount of $25,040.01. Petitioners not only contest the deficiency asserted by the Commissioner but they claim that there is an overpayment in tax for the year 1961 in the amount of $20,192.40. [1] One of the issues raised by the pleadings has been conceded by the petitioners. The only issue for decision is whether petitioners are entitled to a business bad debt deduction in the amount of $129,000 during the year 1961. Findings of Fact Some of the facts have been stipulated, are so found, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners Leonard Lundgren (hereinafter referred to as petitioner) and Evelyn R. Lundgren are husband and wife residing in the State of Oregon. They filed their joint Federal income tax return for the taxable year 1961 with the district director of internal *18 revenue for the District of Oregon. Petitioner has been engaged in the timber and lumber manufacturing business during his adult life. He has conducted this business through partnerships and individual proprietorships. He has also organized, has been and now is an officer of, and has held and now holds substantial stockholdings in corporations engaged in the timber and lumber manufacturing and sales business. RushMore Lumber Company (hereinafter referred to as RushMore) was formed pursuant to an agreement dated February 15, 1956, between petitioner, Raymond B. Lundgren, and Orville A. Young. The parties to this agreement theretofore carried on lumber and ranching businesses as partners under the name of Leonard Lundgren Lumber Company(hereinafter referred to as the partnership). Pursuant to the agreement of February 1956, the following transpired as of March 31, 1956: (1) the major portion of the partnership assets, subject to all the liabilities, were transferred to Lelco, Inc. (hereinafter referred to as Lelco), a corporation formed under the laws of Oregon; (2) the balance of the assets were transferred to RushMore, a corporation formed under the laws of South Dakota; (3) the *19 stock of RushMore and Lelco was issued to the parties in proportion to their partnership interests, i.e., petitioner, 70 percent; Raymond B. Lundgren, 20 percent; and Orville A. Young, 10 percent; and (4) the partnership terminated. Lelco carried on in Bend, Oregon, the same operation as had been performed by the partnership. RushMore was incorporated to set up a sawmill operation in the South Dakota area similar to Lelco. The February 15 agreement specified that the assets transferred to RushMore had a value of $100,000 and that in exchange therefor the partners would receive 100,000 shares of capital stock, par value $1 per share. Minutes of the first meeting of the Board of Directors of RushMore held on April 30, 1956, reflect that the Board of Directors took the following actions: (1) Accepted the offer of the partnership to transfer specified assets to the corporation in exchange for $100,000 aggregate par value of common stock, and the directors determined that such assets had an actual fair cash value of $100,000. (2) Authorized the officers to negotiate with the United States National Bank of Portland for a loan of approximately $250,000, and in the event such loan *20 could not be obtained, the officers were authorized to make application to the Small Business Administration (hereinafter referred to as as the S.B.A.) for the loan. The assets transferred by the partnership to RushMore are identified below, together with the adjusted basis of such assets to the partnership at the time of transfer, and the value assigned to the assets for purposes of supporting the $100,000 in stock issued in exchange therefor: Adjusted Basis to
Assets
Partnership
Assigned Value
Portable sawmill consisting of sawmill and lumber rolls,
portable welder, small motor, edger and saw type
M-330 (edger motor No. 6001) and G.M.C. diesel
$1,996.43
$ 86,900.00
Loraine Moto Crane
4,574.70
10,000.00
1936 Chevrolet express
12,87
100.00
1951 Hyster lift truck RT-150-23785
1,600.00
3,000.00
Totals
$8,184.00
$100,000.00
Immediately after accepting transfer of the above-mentioned assets in exchange for $100,000 of stock, RushMore received an additional $25,000 in cash from the sale of 25,000 shares of capital stock. Such stock was purchased as follows: Cost
Shares
Evelyn R. Lundgren
$ 4,500
4,500
Orville A. Young
1,000
1,000
Other individuals not re-
lated to petitioners
19,500
19,500
$25,000
25,000
*21 Accordingly, capital stock in RushMore was owned as follows: Percentage
No. of
of
Shares
Ownership
Petitioners
74,500
59.6
Raymond B. Lundgren
20,000
16.0
Orville A. Young
11,000
8.8
Other individuals not re-
lated to petitioners [1]
19,500
15.6
125,000
100.0
On June 15, 1956, RushMore applied to the United States National Bank of Portland, Redmond, Oregon, Branch, for a loan of $250,000. This loan application was rejected by said bank in a letter dated June 19, 1956. Thereafter, on July 27, 1956, RushMore applied for a loan in the amount of $250,000 from the S.B.A. As part of the application, petitioner as president of RushMore represented that no lending institution would participate with the S.B.A. in making the loan requested. At that time, petitioner *22 as president of RushMore also represented that there were no present plans for compensation of the officers or directors of said corporation. On August 31, 1956, the S.B.A. authorized a loan of $250,000 to RushMore with interest at 6 percent. This authorization was conditional, and prior to the time the funds were disbursed the following conditions were met: 1. Petitioner personally guaranteed the $250,000 loan. 2. Petitioner gave a mortgage on his sawmill at Sisters, Oregon, to secure the performance of his guaranty agreement. 3. Petitioner agreed to advance to RushMore, subsequent to June 30, 1956, not less than $115,859 plus any amount by which the acquisition costs of the fixed assets for RushMore's sawmill facilities exceeded $473,738. (This was in addition to $29,000 petitioner had already advanced to RushMore.) 4. Between June 30, 1956, and September 25, 1956, petitioner advanced RushMore cash in the amount of $64,500. This was in addition to the $29,000 advanced prior to June 30, 1956. In addition thereto, Lelco supplied goods, material, and labor to RushMore, which account was purchased by petitioner. This account amounted to $43,291.32. Lundgren Sales Corporation *23 advanced $2,634.29 on behalf of RushMore, and this account was acquired by petitioner. Lelco also made travel advances in the amount of $808.44 for RushMore, and this account was acquired by petitioner. Petitioner paid a premium on a life insurance policy, the premium being $4,734.50. The above-mentioned advances by petitioner were the subject of 19 unsecured 4 percent demand promissory notes. 5. Petitioner, by standby agreement, agreed not to take any action to collect said notes, agreed that in case of bankruptcy, receivership, dissolution, or liquidation proceedings of RushMore, the aforementioned notes would, pursuant to the standby agreement, be constituted assigned to the S.B.A. along with other agreements and restrictions, and further agreed that all conditions and restrictions contained in the standby agreement would apply to future loans made by petitioner to RushMore. Petitioner could not collect interest on the various loans without consent of the S.B.A. 6. Petitioner sold, at cost, two timber sales contracts to RushMore. 7. Petitioner personally became surety on a bond in the amount of $200,000 to insure payment of all mechanics' liens in connection with the construction *24 of RushMore facilities. 8. Petitioner, as president of RushMore, agreed that "[No] compensation of any kind shall be paid to any officers of Borrower without prior written approval of S.B.A." 9. Petitioner personally became surety on the performance bonds of timber purchased in the South Dakota area. The conditions of the S.B.A. loan authorization were met, and RushMore received the $250,000 loan proceeds in installments, the first loan disbursement being received in October 1956 and the last disbursement in March 1958. RushMore applied to the S.B.A. for a deferment of the principal portion of the loan installments falling due from September 21, 1957, through July 21, 1958, and as a condition to such deferment the S.B.A. required petitioner to enter into an agreement dated February 14, 1958, whereunder he agreed to advance, or cause to be advanced, certain sums to RushMore, covered by standby agreements. In compliance with this February 14, 1958, agreement, Lelco advanced $23,548.15 covered by standby agreement dated February 14, 1958, and Lundgren Sales Corporation advanced $23,705 covered by standby agreement dated February 14, 1958. In the minutes of a special meeting *25 of the Board of Directors dated January 8, 1958, RushMore authorized the borrowing of sums not to exceed $25,000 from the United States National Bank, Redmond Branch. On June 28, 1960, a fire at RushMore destroyed the sawmill and certain related facilities, but not the dry kilns, planing mill, and other facilities. The book values of the destroyed assets at the time of the fire were: Portable sawmill and related facilities transferred to
RushMore by the partnership
$86,900.00 [1]
Equipment installed by RushMore
80,550.48
Building constructed by RushMore
9,540.69
$176,991.17
Less reserve for depreciation
52,073.95 [2]
$124,917.22
RushMore received insurance proceeds of $124,307.24 for the destroyed assets identified in the preceding paragraph. It was determined that the fire loss was $147,529.04. The amount due RushMore for the loss was reduced to $125,000 *26 ($124,307.24 plus $692.76 of scrap retained by the insured in lieu of cash) because the facilities as a whole were underinsured. The S.B.A. required that the insurance proceeds be applied upon the loan indebtedness. Accordingly, the insurance proceeds of $124,307.24 were paid to the S.B.A. and applied to reduce the loan. On October 11, 1962, the $250,000 note evidencing the loan was stamped "paid." RushMore still has the other facilities which were not destroyed by the fire or sold to satisfy the S.B.A. loan. Unsuccessful attempts have been made to sell the facilities as a unit. Prior to the formation of the partnership on October 1, 1951, petitioner conducted a lumber manufacturing and sales business as a sole proprietorship in and around Bend, Oregon. The portable sawmill which the partnership transferred to RushMore was purchased in 1947 by petitioner for $31,366.65. Upon termination of the proprietorship on September 30, 1951, the cost of the portable sawmill was shown on the books at $34,743.65 with an adjusted basis (cost less depreciation) of $14,738.77. The partnership took over the assets of the proprietorship at the adjusted basis; and the initial net worth of the partnership *27 (at October 1, 1951) reflecting such adjusted basis was $210,628.04. Raymond B. Lundgren acquired a 20 percent partnership interest for $50,000. Orville A. Young acquired a 10 percent partnership interest for $25,000. Lundgren Sales Corporation was formed in 1952. All of the stock of this corporation is and has been owned by petitioner and his wife. Lundgren Sales Corporation sold lumber produced by the partnership until the incorporation of Lelco in 1956, and thereafter sold the lumber produced by Lelco. Lundgren Sales Corporation also sold lumber produced by RushMore. Such relationship between Lundgren Sales Corporation and RushMore was related in the S.B.A. loan application. The sawmill at Sisters, Oregon, operated by petitioner as a sole proprietorship was acquired in January 1953 and sawed logs for the partnership, prior to the termination of the partnership on March 31, 1956. Thereafter, the sawmill at Sisters sawed logs for Lelco. The amount received by the Sisters sawmill was based on a specified amount per thousand board feet of lumber manufactured, with an annual maximum. This sawmill was mortgaged to the S.B.A. as security for petitioner's guarantee of the S.B.A. loan. *28 Petitioner performed services for his corporations. Petitioner received salaries from Lundgren Sales Corporation and Lelco. Petitioner never received a salary from RushMore, payment of any salary to him being prohibited by the S.B.A. loan agreement. Petitioner sold, over a period of years, large quantities of timber to the partnership. After the formation of Lelco, petitioner continued to sell timber to the corporate successor of the partnership. Petitioner claimed capital gain on such sales under section 631(b) of the Internal Revenue Code of 1954 and section 117(k)(2) of the Internal Revenue Code of 1939. Petitioner did not sell any timber to RushMore at a profit. A condition in the loan authorization required that petitioner sell to RushMore at his cost the timber covered by U.S.F.S. timber sales contract No. 12-11-002-11943, executed March 8, 1956, and contract No. 12-11-002-11942, executed March 7, 1956. Petitioner sold the before-mentioned timber sales contracts to RushMore under agreements dated September 21, 1956. These were the only two sales of timber by petitioner to RushMore. Petitioner did not own any timber or timber cutting rights in the *29 South Dakota area. Petitioner never sold stock in a corporation which he formed or caused to be formed or in a corporation controlled by him, and he never received a fee or commission for the formation of any such corporation or received a dividend from any such corporation. Petitioner did not form RushMore with the intention of selling the stock at a profit or receiving any dividends, or collecting a promoter's fee or commission. In 1961, petitioner charged off as worthless $129,000 of the $144,968.55 advanced to Rush More. [2] Respondent in his statutory notice of deficiency has disallowed the deduction in its entirety. Opinion Petitioner contends that the moneys advanced to RushMore were genuine loans. Furthermore, petitioner contends that the loans were business loans in that they were related to petitioner's business of (1) rendering services to corporations for compensation, (2) selling timber to corporations for profit, or (3) manufacturing lumber at Sisters, Oregon, sawmill. [3] Petitioner *30 then maintains that there is a proximate relationship between the advances and the business of petitioner which qualifies the debt of $129,000 as a business bad debt. Respondent, on the other hand, argues that the advances by petitioner were in reality capital contributions to RushMore and did not create genuine indebtedness. In any event, respondent contends that even if the advances did create valid debts, the loss is still a nonbusiness bad debt which, being only partially worthless, is not deductible at all during the year in issue. We agree with respondent. We have our doubts as to whether the advances made by petitioner to RushMore under the circumstances here present created genuine indebtedness rather than equity contributions. The fact that no outside source would make the advances, the fact that the advances were subordinate to the S.B.A. loan, the fact that the advances had to be made before the S.B.A. would grant its loan, the fact that the interest rate was 4 percent while the S.B.A. interest rate was 6 percent, *31 and the fact that the advances were uninsured while the S.B.A. loan was fully guaranteed and covered by mortgages all seem to indicate that the advances were in reality contributions to the capital of RushMore. See Gooding Amusement Co., 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957); Emanuel N. (Manny) Kolkey, 27 T.C. 37 (1956), affd. 254 F. 2d 51 (C.A. 7, 1958); Joseph W. Hambuechen, 43 T.C. 90 (1964). However, we need not decide this question, since it is our opinion that even if the advances constituted genuine indebtedness, as petitioner contends, they nevertheless constituted nonbusiness bad debts which, being only partially worthless in 1961, are not deductible at all. Section 166(d), Internal Revenue Code of 1954. We agree with petitioner when he states that he was carrying on a trade or business within the meaning of section 166(d)(2), Internal Revenue Code of 1954, [4](1) by rendering services to corporations as an officer and employee of corporations, (2) by selling timber to various entities for *32 profit, and (3) by operating a sawmill and manufacturing lumber at his plant in Sisters, Oregon. However, a finding that petitioner was engaged in a trade or business is not of itself sufficient to make the debt in question deductible as a business bad debt. The debt must bear a proximate relationship to such trade or business before it can be considered a business bad debt. Kelly v. Patterson, 337 F. 2d 753 (C.A. 5, 1964); Aubrey S. Nash, 31 T.C. 569, 572-573 (1958); Estate of Dominick F. Pachella, 37 T.C. 347, 352 (1961), affd. per curiam 310 F. 2d 815 (C.A. 3, 1962); George P. Weddle, 39 T.C. 493, 496 (1962), affd. 325 F. 2d 849 (C.A. 2, 1963). See also section 1.166-5(b), Income Tax Regs. *33 For an employee to deduct the loss from a loan made by him to his corporate employer as a business bad debt, he must show that the loan was necessary to maintain his position or was otherwise proximately related to his business of being an employee. Whipple v. Commissioner, 373 U.S. 193 (1963); Eugene H. Rietzke, 40 T.C. 443 (1963). This record is devoid of any evidence showing that petitioner was required to loan RushMore money to keep his position. The very fact that he was the majority shareholder of RushMore would negate such a requirement. Furthermore, petitioner did not receive any salary or other compensation from RushMore nor did he show that he was owed a salary. As was stated in Whipple v. Commissioner, supra, at 204, in any event, the contention [that he was in the business of being an employee] would be groundless on this record since it was not shown that he [taxpayer therein] has collected a salary from Mission Orange or that he was owed one. * * * Accordingly, although petitioner was in the business of being an employee in connection with services rendered to Lelco and Lundgren Sales Corporation, he was not so engaged *34 as far as his connection with RushMore was concerned, since he did not receive a salary. We can see nothing from this record which would show a proximate relation between his services rendered to Lelco or Lundgren Sales Corporation with his loans to RushMore. Therefore, petitioner's being in the business of rendering services does not aid him in this case. Whipple v. Commissioner, supra. Petitioner has been selling timber for many years, at first to his partnership and then to Lelco. All of these sales have been in the Oregon area. This business has been profitable. We have no doubt that petitioner hoped some day to expand his operation and sell timber to RushMore in the South Dakota area. However, as long as the S.B.A. loan was outstanding, petitioner was prohibited from selling any timber to RushMore at a profit. The only two tracts owned by petitioner in the South Dakota area had to be sold to RushMore at petitioner's cost. Petitioner has never sold any timber, except as noted above, to RushMore during its entire existence. On these facts, we cannot say that the loan of money to RushMore was proximately related to petitioner's business of selling timber. Gulledge v. Commissioner, 249 F. 2d 225 *35 (C.A. 4, 1957), affirming a Memorandum Opinion of this Court, certiorari denied 356 U.S. 959 (1958); Walsh v. Commissioner, 313 F. 2d 389 (C.A. 4, 1963), affirming a Memorandum Opinion of this Court; Darwin O. Nichols, 29 T.C. 1140 (1958). What we stated in Darwin O. Nichols, supra, at 1147, is pertinent here: We think that petitioner had some indefinite or generalized hope of future profit, either through his partnership interest, or as a stockholder of the corporation, or both, which he hoped might develop in the wake of the loans which he made, but the vagueness of the arrangements, the lack of any definite understanding or agreement, the failure to condition the loans upon some ascertainable requirement that the corporation "follow through" by making actual purchases in some quantity, the failure to reflect any sales to the corporation on the books of the partnership (or to introduce the corporate records to show purchases from the partnership, if any purchases were made), the failure to show a single specific sale to the corporation (from which we exclude the so-called advances of materials in the amount of $1,634.99 which *36 were never reflected on the partnership books), together paint a picture which falls short of, and is inconsistent with, the view that the loans bore a proximate business relationship to the business of the partnership or that of petitioner as a partner therein. See also Dominick J. Salomone, 27 T.C. 663, 669-670 (1957). Petitioner was also engaged via his sole proprietorship in Sisters, Oregon, in the business of manufacturing lumber. He sawed logs for the partnership and subsequently for Lelco. But once again the record is devoid of any evidence showing that his operation in Sisters did any sawing for RushMore. If petitioner intended for his Sisters operation to include sawing for RushMore some time in the future, we do not have the present proximate relation needed to make a loan to RushMore a business loan because it is related to his sawmill operation. Darwin O. Nichols, supra. Accordingly, we hold that petitioner's loans to RushMore were not proximately related to any business activity carried on by petitioner. Therefore, the loans are nonbusiness loans which, being only partially worthless in the year in issue, are not deductible at all. *37 Decision will be entered for the respondent. Footnotes
1. Petitioners have also included in their petition a claim for refund for the year 1958. The Commissioner not having determined a deficiency in petitioners' income tax for said year, this Court has no jurisdiction to determine an overpayment for 1958. Sec. 6214(b), I.R.C. 1954↩.
1. In 1959, RushMore acquired 9,000 shares of stock from certain of these individuals at the par value in exchange for the corporation's promissory notes. These notes were not paid and are still outstanding. Other than this, there has been no change in stock ownership since 1956. Such acquisition of the 9,000 shares increased the percentage interest of petitioners to 65.35 percent.↩
1. Amount assigned as actual value at time of transfer to RushMore, not book value of transferor partnership. The parties agree that if the Court finds that the advances of $144,968.55 did create a valid indebtedness, the advances became worthless during 1961 to the extent of $129,000.
[2]↩ Includes depreciation of the $86,900 on 10-year straight-line basis, not depreciation of the transferor's lower basis which RushMore was required to use for income tax purposes.
3. Petitioner does not contend that he was in the business of promoting and financing corporations or that he was in the business of making loans.↩
4. SEC. 166. BAD DEBTS (d) Nonbusiness Debts. (2) Nonbusiness Debt Defined. - For purposes of paragraph (1), * * * the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩