Irving Blauner and Frances Blauner v. Commissioner.
Blauner v. Commissioner
Docket No. 4357-65.
United States Tax Court
T.C. Memo 1967-156; 1967 Tax Ct. Memo LEXIS 114; 26 T.C.M. (CCH) 726; T.C.M. (RIA) 670156; June 30, 1967
*114 Karl W. Windhorst, Twin Lakes Rd., Salisbury, Conn., and Howard Gould, for the petitioners. William F. Chapman, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies in petitioners' income taxes for the years 1952 and 1953 in the respective amounts of $18,072.10 and $4,522.74. Petitioners, in addition to controverting the determinations, claim that they overpaid their taxes for the calendar year 1953. The issues are whether certain loans and related rights acquired by subrogation, and which admittedly became worthless during the years in issue, are deductible by Irving Blauner as business or nonbusiness bad debts; and whether certain related expenses of Irving Blauner were personal or business connected. Findings of Fact Some of the facts have been stipulated and are so found. Petitioners Irving and Frances Blauner are husband and wife whose residence has been New York City at all relevant times. Their Federal income tax returns for the calendar years 1952 and 1953 were prepared and filed on the cash receipts and disbursements method with the district director of internal revenue, Third *115 District (now Manhattan District), New York, New York. Irving Blauner will hereinafter sometimes be referred to as Irving or petitioner. In about 1910 Harry Blauner, who was Irving's father, and two of the father's cousins formed Blauner's, Inc., sometimes referred to herein as the corporation, to own and operate a popular to medium price retail store selling ladies' and children's apparel in Philadelphia, Pennsylvania. Harry Blauner originally owned 50 percent of the stock of the corporation and each cousin owned 25 percent of the stock. At some undetermined point in time, and probably about 1930, Blauner's, Inc., was listed on the Curb (now the American) Stock Exchange, but a large though undetermined amount of the stock of the corporation continued to be owned by Irving and by various other members of the Blauner families through the years in issue. Blauner's, Inc., was successful in its undertaking and during the 1930's it expanded by acquiring and operating additional stores, largely through a wholly-owned subsidiary. During the 1950's approximately 55 to 65 stores with annual sales of $25,000,000 to $30,000,000 were operated by the corporation and its subsidiary. Irving *116 first became associated with Blauner's, Inc., as a stock boy, about a year after it was formed. At this time Irving was about 20 years of age. During the following 8 or 9 years he held the positions of assistant buyer, buyer, assistant merchandise manager, merchandise manager, and he became general merchandise manager in 1918 or 1919. The record is silent as to the number of shares owned by Irving or his percentage ownership of the corporation at any given time but it does reveal that during the years in issue petitioners were paid dividends on the corporation's stock in the respective amounts of (1952) $58,320.50 and (1953) $56,288 while during those same years Irving's salary from the corporation was (1952) $34,776.91 and (1953) $34,887.56. During the early 1920's Irving was elected to the corporation's board of directors and was elected vice president. He remained in charge of all purchasing and merchandising policies of the corporation and was and continued to be the executive primarily responsible for fixing all executive salaries, including his own. Shortly after his father's death and in about 1950, he was elected president of the corporation and remained in that position *117 through the years in issue. During its entire existence the corporation's stores were engaged in a highly competitive business. This competition extended to procurement of merchandise from manufacturers and suppliers and included such elements as price, early deliveries, superior styling, preferential deliveries as to scarce or highly successful items, etc. Such items are referred to in the trade as "hot line" merchandise. Early in his career and before 1920, Irving became concerned with the securing and development of manufacturers and suppliers for the corporation which would give it preferential treatment as to "hot line" merchandise. Such manufacturers and suppliers are referred to in the trade as "resources." In about 1920 he became interested in a small Philadelphia manufacturer doing business as Gertrude Dress Company, who lacked sufficient operating capital to produce the volume which the corporation desired. Irving recommended that the corporation make a loan to this supplier but it declined to do so, preferring to use its capital for expansion, and consequently Irving made the loan personally lending $2,000 to Gertrude Dress on a noninterest bearing demand note. *118 Thereafter Gertrude Dress Company became a "resource" of the corporation and during the next 6 or 7 years Irving made at least one additional loan of $5,000 to such company on similar terms. Thereafter and until some time in the early 1940's Irving made several similar personal loans to prospective "resources" for the corporation all of which were apparently repaid. Such loans were made to Loma Dress Company (loan discounted in lieu of interest), Lombardi Dress Company, Park Lane Dress Company, Blue Comet Dress Company, Al Weinberg Dress Company, and Royal Dress Company. Such loans ranged from about $1,500 to about $25,000 and one, made to a cousin, was higher. The record is silent as to whether or not these loans were secured. The record is silent as to further such loans for a period of about 7 or 8 years during the latter 1940's and until 1950 when Irving loaned $3,333.33 to Sidney Gilston, who for many years prior to 1950 had styled and designed a line of merchandise for National Garment Company, a supplier to the corporation. In 1950 Gilston decided to go into the manufacturing business for himself and he came to Irving, who regarded him highly, requesting a loan of $10,000. *119 Irving loaned him one-third of this amount, but the record is silent as to the due date and as to whether the loan was interest bearing. None of the loan had been repaid in 1952 when Gilston suddenly became ill and died a bankrupt. Respondent has stipulated that this debt became worthless in the year 1952. Petitioners' only child, Sally Blauner, married John Weitz (hereinafter called Sally and Weitz, respectively) in 1944. Weitz was then 19 years of age. He was discharged from the Army in 1945 and immediately joined his father's firm, The Weitz Corporation, as a stylist and designer of women's negligees. In about 1947 Weitz formed John Weitz Juniors, Inc., which entered into the dress manufacturing business. Petitioner and Frances Blauner furnished the required capital for the formation and launching of this corporation, the stock of which was issued and thereafter held, 51 percent to and by Weitz and 49 percent to and by Sally. These loans, totaling $35,000, were made to Weitz, individually, as follows: From Irving Blauner -
July 10, 1947
$5,000
Jan. 13, 1948
$7,500
Feb. 7, 1949
$5,000
From Frances Blauner -
July 10, 1947
$5,000
Jan. 6, 1948
$7,500
Feb. 3, 1949
$5,000
*120 The record is silent as to due dates and interest requirements. These loans were claimed as nonbusiness bad debts by the petitioners on their 1953 Federal income tax return with the explanation: "This money had been loaned to John Weitz to enable him to go into business. Due to financial reverses the business was suspended in 1953. All demands on Mr. Weitz for payment were refused on the grounds of inability to pay." Respondent agrees that these loans became worthless during 1953. In late 1951 or early 1952 John Weitz Juniors, Inc., was in financial difficulty and in need of working capital because of labor trouble and a strike. Irving had loaned this corporation $5,000 in 1951 and on May 16, 1952, the following agreement was made between John Weitz Juniors, Inc., Weitz, Sally, and Irving: AGREEMENT, made this 16 day of May, 1952, among JOHN WEITZ JUNIORS, INC., a New York corporation, with its principal office at No. 1 West 34th Street, in the Borough of Manhattan, City, County and State of New York (hereinafter referred to as the "Company"), JOHN WEITZ, residing at No. 70 East 96th Street, in the Borough of Manhattan, City, County and State of New York, (hereinafter referred *121 to as "Weitz"), and SALLY B. WEITZ, residing at No. 70 East 96th Street, in the Borough of Manhattan, City, County and State of New York (hereinafter referred to as "Sally B. Weitz"), and IRVING BLAUNER, residing at 730 Park Avenue, in the Borough of Manhattan, City, County and State of New York (hereinafter referred to as "Blauner"); WITNESSETH WHEREAS, the Company has requested Blauner to loan to the Company the sum of Twenty thousand Dollars ($20,000.00), said loan to be evidenced by the promissory note of the Company payable to the order of Blauner, executed and delivered simultaneously herewith (hereinafter referred to as the "Note"); and WHEREAS, Blauner is willing to make such loan upon the representations made by the Company and Weitz, upon the terms and conditions hereinafter set forth: NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements herein contained, it is represented and agreed as follows: 1. The Company and Weitz do hereby jointly and severally represent to Blauner as follows: (a) That annexed hereto and made a part hereof is a balance sheet of the Company as of March 29, 1952, setting forth the assets and liabilities of the *122 Company as at such date, that such balance sheet is true, correct and accurate in all respects and that no changes have occurred in such assets and liabilities except those which have occurred in the ordinary course of business; (b) that the Company is duly organized and existing under the laws of the State of New York, and is not restricted or prohibited in any manner from entering into this transaction by any provision of law, or by any provision, express or implied, containedd in its certificate of incorporation, by-laws or any other instrument; (c) that the Company has an authorized capital stock of Two hundred (200) shares without nominal or par value; (d) that the Company has issued One hundred forty (140) shares of its capital stock, of which Seventy-one (71) shares are held of record by Weitz and Sixty-nine (69) shares are held of record by Sally B. Weitz; that no other shares have been issued, and that all of said shares of capital stock so issued and outstanding are fully paid and non-assessable; (e) that the execution of the Note and this Agreement by the Company have been duly authorized and consented to by all of its stockholders and its Board of Directors. 2. Weitz *123 represents to Blauner that he is the owner and holder of record, free and clear of all encumbrances, of every kind, nature or description, of Seventy-one (71) shares of the capital stock of the Company. Sally B. Weitz represents to Blauner that she is the owner and holder of record, free and clear of all encumbrances, of every kind, nature or description, of Sixty-nine (69) shares of the capital stock of the Company. 3. The Company is presently indebted to Blauner in the sum of Five thousand Dollars ($5,000.00). Blauner agrees simultaneously herewith to loan to the Company the further sum of Twenty thousand Dollars ($20,000.00), which loan is to be consolidated with the aforementioned indebtedness owing to Blauner by the Company in the sum of Five thousand Dollars ($5,000.00), said aggregate indebtedness of Twenty-five thousand Dollars ($25,000.00) to be evidenced by, and payable in accordance with, the terms and provisions of the Note, which is being executed and delivered by the Company to Blauner simultaneously herewith. 4. Blauner agrees that the Note and the indebtedness evidenced thereby, and interest payable thereon, shall be subject and subordinate to any and all existing *124 and future indebtedness of the Company, arising out of bank loans and merchandise purchases incurred by the Company through December 31, 1952. 5. The Company and Weitz jointly and severally agree that until the Note and all interest thereon shall be paid in full, the Company will (a) not declare or pay any dividends on any of the stock of the Company; (b) not purchase, redeem or otherwise acquire or make any distribution of any kind on any of the shares of the capital stock of the Company; (c) not issue or sell the authorized capital stock, treasury or unissued, of the Company; (d) not authorize for issue any stock of any kind by the Company; (e) furnish to Blauner quarterly, or at such times as Blauner shall request, financial statements, profit and loss statements, and balance sheets prepared by the accountant in the regular employ of the Company, and will also, from time to time, furnish to Blauner such other information and data with respect to the earnings, assets, property and affairs of the Company as Blauner shall, from time to time, request; and (f) permit Blauner or his representative to examine the books, records, accounts and properties of the Company at such times as *125 Blauner shall designate. 6. Simultaneously herewith Weitz has caused to be transferred upon the books of the Company into the name of Blauner his Seventy-one (71) shares of the capital stock of the Company, and Sally B. Weitz has caused to be transferred upon the books of the Company into the name of Blauner her Sixty-nine (69) shares of the capital stock of the Company, all of said shares being transferred to Blauner as security for the payment by the Company of the sum of Twenty-five thousand Dollars ($25,000.00), and interest, in accordance with the terms and provisions of the Note. Weitz and Sally B. Weitz agree that until the Note and all interest thereon shall be paid in full, Blauner shall have the sole and exclusive right to vote said shares of stock upon all matters and things requiring the vote or consent of stockholders, including, but not limited to, the dissolution of the Company, and Blauner shall be entitled to exercise such exclusive voting right in respect of said shares of stock at any time either prior to or after the maturity of the Note. 7. The parties hereto do hereby agree that they will cause the certificates of stock of the Company to be transferred by *126 Weitz and Sally B. Weitz, respectively, to Blauner, as provided in paragraph "6" of this Agreement, to be endorsed with the following legend: "This certificate and the shares represented thereby are, and shall be, subject to all the terms, covenants and provisions of an agreement in writing, dated May 16, 1952, among JOHN WEITZ JUNIORS, INC., JOHN WEITZ, SALLY B. WEITZ and IRVING BLAUNER, and the holder of this certificate by the acceptance thereof, agrees to be bound by all of the terms, covenants and provisions of said agreement, a copy of which has been lodged with the said JOHN WEITZ JUNIORS, INC." 8. Each and all of the obligations of the Company, Weitz and Sally B. Weitz hereunder are declared to be joint and several. IN WITNESS WHEREOF, the Company has caused these presents to be executed by its duly authorized officer and its corporate seal to be hereunto affirmed, and the individuals hereto have hereunto set their respective hands and seals the day and year first above written. John Weitz Juniors, Inc., was insolvent by the end of 1952 and respondent does not contest that this loan became worthless during 1952. Petitioners deducted such loan ($25,000) as a business *127 bad debt on their 1952 Federal income tax return. In connection with his loans to Weitz and John Weitz Juniors, Inc., petitioner had guaranteed accounts to certain suppliers, and demands were made upon him in 1953 based upon such guarantees. Petitioner thereupon marshalled the assets of John Weitz Juniors, Inc., and personally appropriated its properties, collected its receivables and paid its debts which he had guaranteed and which (respondent agrees) exceeded its marshalled assets in the net amount of $6,650.83. In connection with the above activity and in attempts to collect from Weitz, Irving incurred an attorney's fee of $1,650 which he paid in 1953. John Weitz and Sally had marital difficulties and separated sometime during the summer of 1952. They were divorced early in 1953. Petitioners deducted Irving's loans to Sidney Gilston and to John Weitz Juniors, Inc., (a total of $28,333.33) on their 1952 return as business bad debts. Respondent determined that they were not debts of that character and allowed the deductions as capital asset losses under section 23(k)(4), [1] making requisite adjustments. *128 On their return for 1953 the petitioners deducted the net of $6,650.83 which Irving had paid on the accounts of John Weitz Juniors, Inc. Respondent determined that such sum was not deductible as a business bad debt but did not make the adjustments requisite to a capital asset loss. Respondent did not disturb petitioners' 1953 claim for a nonbusiness bad debt loss of $35,000 based upon their loans to Weitz, but petitioners now contend that the $17,500 [2] of this amount which was loaned by Irving was a business bad debt, incurred in connection with Irving's trade or business as an employee-officer of Blauners, Inc., and is fully deductible. The petitioners now contend further that the attorney's fee of $1,650 which Irving paid in 1953 was omitted from their 1953 return through oversight, was proximately related to Irving's trade or business, and is deductible. Opinion Petitioners' basic position as to all of the deductions which they claim in 1952 and 1953 (Irving's loans, the net *129 amount of the related rights which he had acquired by subrogation and his related attorney fee expense) is that all were proximately related to Irving's trade or business of being an officer and an employee of Blauner's, Inc., and were therefore fully deductible in the years when claimed as business bad debts under section 23(k) and (as to the attorney fee expense) under section 23(a)(1)(A). Respondent either agrees to or does not controvert the amounts of the claimed deductions, or the year when claimed, but urges that they were all unrelated to Irving's trade or business or were personal in nature. The cases are in complete accord that the resolution of the basic proposition thus presented is to be determined from the particular facts of each case, and thus citations are unnecessary. See also Regs. 111, section 29.23(k)-6, which provides in pertinent part: The question whether a debt is one the loss from the worthlessness of which is incurred in the taxpayer's trade or business is a question of fact in each particular case. We first consider the loss deductions which are claimed because of the loans to Weitz and to John Weitz Juniors, Inc., and conclude that petitioners have *130 fallen far short of sustaining their burden of proof that such losses were proximately related to the conduct of Irving's trade or business as an officer-employee of Blauner's, Inc. Among the factors which have led us to this conclusion are the following: Weitz was petitioner's son-in-law. He was a young man just getting started in business in the late 1940's when the loans were made. Half of these loans were made by Frances Blauner, who was neither an employee nor an officer of Blauner's, Inc., and when the loans went bad in 1953 the entire sum was claimed as a nonbusiness bad debt on the petitioners' return with the explanation that the money had been loaned to Weitz to enable him to go into business. This entire sum ($17,500 from Irving and $17,500 from Frances Blauner) was loaned to Weitz to enable him to form and launch John Weitz Juniors, Inc., the stock of which was issued and thereafter held 51 percent by Weitz and 49 percent by Sally, the petitioners' only child. When that corporation got into financial difficulties in May 1952, Weitz and Sally pledged all of said stock to Irving as security for his loan of May 16, 1952. Irving's loans to John Weitz Juniors, Inc., have *131 the same family and personal characteristics. That corporation was 49 percent owned by his only daughter when it was experiencing financial difficulties in 1951 and 1952. Irving's $5,000 advance to that corporation was made in 1951. The May 16, 1952, agreement which increased the debt to $25,000 contained such stringent security provisions as to bolster our belief that the loan would not have been made except for the family relationship, and was principally for Sally's benefit. The fact that Weitz and Sally were starting to have marital difficulties in 1952 had no effect on Sally's ownership of John Weitz Juniors, Inc., and so does not influence our conclusion. We feel that the facts of record are overwhelming in their indication that the loans to Weitz and to John Weitz Juniors, Inc., were made for personal family reasons and that there had been no change in this characteristic up to the times the loans became worthless. [3] Therefore the losses resulting from their becoming worthless bore no proximate relation to Irving's trade or business and we so hold. It follows that they are deductible under section 23 (k)(4) as nonbusiness bad debts, and not otherwise. *132 When Irving paid the net amount ($6,650.83) of the John Weitz Juniors, Inc., accounts which he had guaranteed, he became subrogated to those rights against that corporation, Putnam v. Commissioner, 352 U.S. 82, 85; George P. Weddle, 39 T.C. 493, 495, affd. 325 F. 2d 849 (C.A. 2); Eugene H. Rietzke, 40 T.C. 443; R. B. Cowden, 34 T.C. 819, 825, and was thus a creditor of that corporation to this further extent. Respondent does not contest the amount or the year of this claimed deduction (1953) but argues that the character of the debt is identical to, and in effect a part of, Irving's loans to Weitz and John Weitz Juniors, Inc. We are of the same opinion and hold that this $6,650.83 is also deductible only as a nonbusiness bad debt. Petitioners contend that the attorney's fee of $1,650 which Irving paid in 1953 is fully deductible under section 23(a)(1)(A) as an ordinary and necessary business expense of Irving's in connection with his trade or business of being an employee and officer of Blauner's, Inc., stating that the expense of the attorney's fee was incurred solely by reason of the loans to John Weitz Juniors, *133 Inc. The bill rendered by this attorney to Irving reads on its face: To services rendered in examination of documents involving claims against Weitz arising from business transactions and guarantees; to consultation and advice in connection therewith: $1,650. We have found that this expense was incurred by Irving in connection with his transactions with Weitz as well as with John Weitz Juniors, Inc. We have already held that these transactions were entirely personal in character, and therefore petitioner's contention must fail. Nor were these transactions entered into for profit as was the case in Peter Stamos, 22 T.C. 885; and Marjorie Fleming Lloyd-Smith, 40 B.T.A. 214. It seems quite clear to us that this expense is so closely related to Irving's loans to Weitz and John Weitz Juniors, Inc., as to assume identical characteristics, Katherine Ander, 47 T.C. 592; and cf. Ticket Office Equipment Co., 20 T.C. 272, affirmed per curiam 213 F. 2d 318 (C.A. 2); and Arrowsmith v. Commissioner, 344 U.S. 6. This brings us finally to consideration of the claimed business bad debt deduction for the worthlessness *134 in 1952 of Irving's loans to Sidney Gilston. Petitioner argues that commencing in about 1920 he became convinced that Blauner's, Inc., would benefit greatly if it could procure a number of good "resources" to give it preferential "hot line" merchandise and that when the corporation, though agreeing with him in principle, declined to make loans to manufacturers and suppliers that he personally entered upon such a course of conduct. We have found that Irving did indeed make some such loans as are detailed in our findings and we are impressed by the fact that many of them were noninterest bearing. It is now axiomatic that the business of a corporation is not the business of its owners or employees but that an employee and/or officer of a corporation can be in the trade or business of rendering services to that corporation. See and compare Dalton v. Bowers, 287 U.S. 404; Burnet v. Clark, 287 U.S. 410; Estate of Dominick F. Pachella, 37 T.C. 347; Charles G. Berwind, 20 T.C. 808; and Kelly v. Patterson, 331 F. 2d 753; with George P. Weddle, 39 T.C. 493, 496, affd. 325 F. 2d 849 (C.A. 2); S. E. Maitland Brenhouse, 37 T.C. 326; *135 Wilfred J. Funk, 35 T.C. 42; J. T. Dorminey, 26 T.C. 940; Stuart Bart, 21 T.C. 880; and cf. Whipple v. Commissioner, 373 U.S. 193. Irving argues that these early loans which he made to suppliers and the loan which he made to Sidney Gilston in 1950 were all made because of, and to enhance his position as an officer and an employee of the corporation, and to advance his position in the corporation and increase his salary and bonuses from it. If we were considering a claimed business loss deduction because of the worthlessness of one of the early loans we might be impressed with his argument that the loss was proximately related to Irving's trade or business of being an officer and an employee of the corporation, for he was then a relatively young man whose stature in his employment was increasing. Considering the Gilston loan, however, we note that it was made in 1950, some 7 or 8 years after Irving's last prior loan to a supplier and that it went bad in 1952. When the earlier loans were made Irving was the corporation's general merchandise manager. When the loan to Gilston was made he already had, or was about to achieve the *136 corporation's top executive position of president. We do not know the percentage of Irving's stock ownership of the corporation at any given time and therefore must assume that he owned less stock when the early loans were made than he did in 1950. The record does show as to 1952 when the Gilston loss occurred [4] that the petitioners' dividend income from the corporation was more than $58,000, while Irving's salary for that same year was a little under $35,000. The record also shows that Irving was then and had for many years been the executive primarily responsible for recommending all salary levels, including his own, to the corporation's board of directors. Petitioners strongly urge the similarity of Irving's position to that of petitioner in Trent v. Commissioner, 291 F. 2d 669, but we fail to see any similarity. The taxpayer's situation in Trent was summarized by the Supreme Court in Whipple v. Commissioner, 373 U.S. 193, 204, as follows: [his] loan was necessary to keep his job or was otherwise proximately related to maintaining his trade or business as an employee. In so summarizing Trent the Supreme Court *137 observed (p. 204) that proof of such conditions might be difficult to furnish where the taxpayer was the sole or dominant stockholder of the corporation, and we cannot hold from the record that Irving's position as a stockholder of the corporation was not a dominant one. See also Eugene H. Rietzke, 40 T.C. 443, 450-51. The Supreme Court also stated in Whipple, supra, at p. 202: Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business *138 [that of being an officer and employee of the corporation] but from that of the corporation. Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business. Also see and compare the following cases which have considered whether a taxpayer's actions were taken as a shareholder or as an employee of a corporation: George P. Weddle, supra; Burnet v. Clark, supra; Dalton v. Bowers, supra; Deputy v. DuPont, 308 U.S. 488. Having carefully considered the entire record, we hold that petitioners have failed their burden of proving that Irving's loan to Gilston was related to his trade or business of being an officer and employee of the corporation or that the loss resulting from the debt becoming worthless was proximately related thereto. We observe that the factors which we have considered and discussed in connection with the Gilston loan are equally applicable to the Weitz and John Weitz Juniors, *139 Inc., loans and related subrogated rights and related expenses, and furnish additional reasons for not allowing them as business bad debts or ordinary and necessary business expense deductions. As has been indicated, any adjustments requisite to losses here held to be allowable under section 23(k)(4) and not heretofore made by respondent, shall be made under Rule 50. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1939.↩
2. In their petition, petitioners allege that an additional $8,000 had been loaned to Weitz by Irving to support a total 1953 deduction of $25,500, but this additional claim is now abandoned.↩
3. It is the relationship of the debt to the trade or business at the time of loss which is controlling. Regs. 111, sec. 29.23(k)-6; S. E. Maitland Brenhouse, 37 T.C. 326, 329; Tony Martin, 25 T.C. 94, 99↩.
4. See footnote 3, supra.↩