Isidor Jaffe and Anna Jaffe v. Commissioner. Samuel Jaffe and Bette Jaffe v. Commissioner.
Jaffe v. Commissioner
Docket Nos. 2903-66, 2904-66.
United States Tax Court
T.C. Memo 1967-215; 1967 Tax Ct. Memo LEXIS 48; 26 T.C.M. (CCH) 1063; T.C.M. (RIA) 67215; October 30, 1967
*48 Held, losses growing out of loans made by two taxpayers, stockholder-employees, to their wholly owned corporation, as well as losses from guarantees of loans by a bank to their corporation, were business bad debts, deductible in full under section 166(a), I.R.C. 1954; the loans and guarantees did not result in "nonbusiness" debts under section 166(d), since taxpayers were motivated by a purpose to protect their jobs, both of them being virtually unemployable elsewhere. Bruce I. Hochman, for the petitioners. Marion Malone, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax for 1959 in the following amounts: Isidor and Anna Jaffe
$ 8,867.82
Samuel and Bette Jaffe
12,425.27 The sole issue is whether losses sustained in 1962 by Isidor and Samuel, primarily in connection with loans or guarantees of loans to their wholly owned corporation, were business bad debts under section 166(d), I.R.C. 1954, so as to be taken into account in computing a net operating loss carryback to 1959. Findings of Fact The stipulation of facts filed by the parties, together with accompanying exhibits are incorporated herein by reference. Isidor *49 and Anna Jaffe, petitioners in Docket No. 2903-66, are husband and wife. Isidor is the father of Samuel Jaffe, who together with his wife Bette are petitioners in Docket No. 2904-66. Both couples filed their joint income tax returns for the year in question with the district director of internal revenue at Los Angeles, California, and were residents of Los Angeles County, California when they filed the petitions herein. Isidor and Samuel will sometimes hereinafter be referred to as petitioners. Petitioners began the buying and selling of scrap metal in the Los Angeles area during 1946. They conducted their business as a partnership known as Jaffe Iron and Metal Company, sometimes hereinafter referred to as "Jaffe Iron." By 1956 the partnership was also engaged in activities as an importer and wholesaler of steel materials. In 1956 petitioners organized a corporation named Jaffe Steel and Supply Company (hereinafter sometimes referred to as "Jaffe Steel") to take over the business of importing and wholesaling of steel materials theretofore carried on by the partnership. Jaffe Iron continued to conduct the scrap business, dealing in new and used salvage type materials primarily on a *50 retail basis. Both the partnership and corporate businesses were carried on in El Monte, California until 1959 when both moved to Long Beach, California. The new business premises consisted of about 10 acres, but only about half an acre or an acre was devoted to the operations of the partnership. Father and son each owned 50 percent of the stock of the corporation, and each had a 50 percent interest in the partnership. The son appears to have played the dominant role in these enterprises, in charge of the operation as its chief executive officer. The father was 70 years old in 1959. He worked full time and served as a supervisor or general manager. Petitioners' tax returns disclose the following income from the two enterprises: Jaffe Steel
Isidor
Samuel
1959
$15,600 (wages)
$15,600 (wages)
1960
15,600 (wages)
15,600 (wages)
1961
2,600 (wages)
6,150 (wages)
1962
none
none
Jaffe Iron
1959
$18,006.84 (ordinary income)
$18,006.84 (ordinary income)
19,893.19 (long-term capital gain)
19,893.19 (long-term capital gain)
1960
(1,895.02) (partnership loss)
(1,895.03) (partnership loss)
1961
none
none
1962
none
none No dividend income from Jaffe Steel was reported for any of the years 1959-1962. In 1957, petitioners undertook *51 the construction of a steel mill for the manufacture and prefabrication of steel. Two new corporations were established for this purpose: Cumberland Properties, Inc. [1] ("Cumberland") was to hold the property on which the mill was to be built, and American Steel Rolling Mills, Inc., [2] *52 ("American Rolling Mills"), was to construct the mill. At least as early as September 24, 1960, petitioners each owned 500 shares of Cumberland's $1 par value common stock and this was Cumberland's only outstanding stock. Sometime in 1958, petitioners made advances to Jaffe Steel in respect of which the following amounts were outstanding as of December 31, 1961: Samuel
$16,018.13
Isidor
10,865.16
Sometime in 1959, Jaffe Steel borrowed $39,000 from Union Bank ("Union"). Union required petitioners to guarantee and to pledge security for the loan. Petitioners gave notes to the bank in the following amounts: Isidor
$22,000
Samuel
17,000 Jaffe Steel then issued its notes in the following amounts: $22,000, payable to Isidor Jaffe and Union Bank, $17,000, payable to Samuel Jaffe and Union Bank. Further, petitioners pledged their personal savings account passbooks to Union in amounts slightly greater than the loan. The funds received by Jaffe Steel from Union were used to discharge a state sales tax encumbrance in the amount of $26,000 and to make payment on a note. The parties have stipulated that credit and advances of money needed for the construction of the new mill were made to American Rolling Mills by various parties who thereby became its creditors. The assets and liabilities of Jaffe Steel, Jaffe Iron and Cumberland as of June 30, *53 1960 are reflected by the following combined balance sheet: COMBINED BALANCE SHEET
June 30, 1960
TOTAL
Cumberland
(Inter-
ASSETS
Jaffe Steel
Jaffe Iron
Properties
Co. Elim.)
Cash on hand & in bank
$ 1,742
$ 832
$ 49
$ 2,623
Accounts receivable
20,514
110,336
130,850
Employees receivable
186
315
501
Merchandise inventory
235,100
30,000
265,100
Advances - Cumberland Prop.
376,689
40,603
Advances - Jaffe Iron
44,111
Real estate at book value: 1. Land and bldg. (Permanent)
157,212
157,212
2. Mill bldg. & equip. in process of
construction
410,916
410,916
Furniture, autos & equip.
24,013
24,013
Other assets - deposits, etc.
375
375
TOTAL ASSETS
$678,717
$206,099
$568,177
$991,590
LIABILITIES
Note payable - F.M.
$103,162
$103,162
Trade acceptances & accounts payable
302,370
$ 25,568
327,938
Advances from factor
7,941
93,526
101,467
Taxes payable
11,814
5,380
17,194
Loans payable - officers
46,206
46,206
Loans payable - Union Bank
28,994
28,994
Loans payable - Monkarsh & Kramer
30,000
30,000
Loans payable - Insurance
2,710
2,710
Loans payable - Jaffe Steel
44,111
376,689
Contract payable - equipment
11,286
9,851
21,137
Loan payable - Jaffe Iron
40,603
Trust deed payable - real estate
171,536
171,536
TOTAL LIABILITIES
$533,197
$179,871
$598,679
$850,344
NET WORTH - June 30, 1960
$141,246
*54 In 1960 petitioners found themselves in financial difficulties, and a number of lawsuits were pending against them and their corporations at that time. In an effort to find a way out of the difficulties, petitioners, Jaffe Steel and Cumberland entered into a contract on September 24, 1960 with Baruch-Foster Corporation ("Baruch-Foster"), a creditor unrelated to petitioners or their corporations. The contract was highly involved. It provided for a loan of $50,000 by Baruch-Foster to Cumberland, plus additional loans at Baruch-Foster's discretion. In substance, the contract also provided in part as follows: 1. Petitioners would transfer all assets of Jaffe Iron to Jaffe Steel as a contribution to capital, and would pledge all their stock in Jaffe Steel as well as in Cumberland as part of the security for Baruch-Foster's loan to Cumberland. 2. Jaffe Steel and Cumberland would have new boards of directors, each consisting of Samuel Jaffe and two of Baruch-Foster's nominees. Samuel would serve as vice president in both corporations. The other officers would be representatives of Baruch-Foster. 3. Baruch-Foster would create a new corporation, American Steel Rolling Mills, Inc. ("Rolling *55 Mills") [3] with total authorized stock of 1,900 shares, of which Baruch-Foster would acquire 1,539 shares. Samuel Jaffe was to be an officer and director of Rolling Mills. Rolling Mills was to purchase the assets of Cumberland on certain conditions, and upon repayment of all loans, Rolling Mills was to issue 361 shares of its stock to Cumberland. 4. Upon purchase of the Cumberland assets, Rolling Mills was to pay Isidor Jaffe $200 per week to be applied in repayment of loans he had made to Jaffe Steel, Jaffe Iron and Cumberland, and thereafter to be applied toward the purchase price of the Cumberland assets. 5. Samuel Jaffe was to enter into a non-competition agreement, providing that if he were to leave the employ of Jaffe Steel voluntarily while earning at least $1,500 a month, he would be unable to compete with Jaffe Steel or Cumberland for a period of three years in a specified area. In accordance with the contract, petitioners on September 24, 1960, executed a pledge of all their stock in Jaffe Steel and Cumberland to Baruch-Foster to secure loans made by Baruch-Foster to Cumberland in the aggregate amount of *56 $177,415.07. Baruch-Foster formed American Steel Rolling Mills, Inc. ("Rolling Mills"), a Delaware corporation, for the purpose of acquiring the business entities and properties of Jaffe Steel, Cumberland and American Rolling Mills. The contract of September 24, 1960 was superseded by a later contract dated March 24, 1961. The parties to the later contract were the same as in the earlier one, except that American Steel Rolling Mills, Inc. ("Rolling Mills"), which had meanwhile been organized, was also a party. Rolling Mills had not yet purchased the assets of Cumberland. Some of the provisions of the March 24, 1961 contract may be summarized as follows: 1. In addition to notes for outstanding indebtedness to Baruch-Foster in the aggregate amount of $177,415.07, Cumberland acknowledged its indebtedness and delivered to Baruch-Foster a note in the amount of $100,000 for management services furnished to Cumberland and Jaffe Steel by Baruch-Foster from September 29, 1960 to March 24, 1961. Cumberland also agreed to reimburse Baruch-Foster for certain expenses up to March 31, 1961 in an aggregate amount not in excess of $60,000. 2. Baruch-Foster agreed to lend Cumberland an additional $18,440.94. *57 3. Petitioners transferred to Cumberland, as a contribution to capital, all of the outstanding shares of Jaffe Steel (to which they had already contributed all of the assets of Jaffe Iron). 4. Cumberland agreed to sell all its assets under certain conditions to Rolling Mills for $118,440.94, the assumption of Cumberland's obligations to Baruch-Foster, and the issuance of 361 shares of Rolling Mills stock to Cumberland after payment of all creditors' claims (with certain exceptions) against Jaffe Steel. 5. Petitioners agreed to waive payment of $49,437.49 from Jaffe Steel in respect of debts owing to them by Jaffe Steel until all other indebtedness of Jaffe Steel, with certain exceptions, should be paid in full. 6. Rolling Mills agreed to pay Isidor $400 semi-monthly until an amount equal to Jaffe Steel's debt to him was paid. Rolling Mills also agreed to pay him $400 semi-monthly until $118,440.94 was paid, such payments to be applied against the total amount due to Cumberland. 7. Cumberland agreed to pay $18,440.94 to Jaffe Steel which in turn agreed to pay 1959 Federal and State income taxes of petitioners aggregating that amount, such payment to be applied against Jaffe Steel's *58 debt to petitioners. 8. Baruch-Foster agreed to cause the election of Samuel Jaffe as one of the five members of the board of directors of Rolling Mills and to use its best efforts to cause his election as a vice president of Rolling Mills. On May 22, 1961, the parties to the March 24, 1961 agreement entered into a Supplemental Agreement whereby Samuel Jaffe resigned as an officer, director and employee of Jaffe Steel. Further, any arrangement that he serve as an officer or director of Rolling Mills was rescinded. He was also released from his convenant not to compete, except that he agreed not to use any name similar to Jaffe Steel & Supply Co. and other specified names or combinations thereof in Southern California. Sometime prior to January 12, 1962, the corporate name of Jaffe Steel was changed to Barco Steel & Supply Co. ("Barco"). On January 12, 1962, Baruch-Foster, Barco, Cumberland, Rolling Mills, petitioners and two other creditors of Barco entered into a final agreement which terminated all interest that petitioners may have had in any of the foregoing corporations, except that Rolling Mills agreed to issue 81 shares of its stock to Samuel Jaffe without further consideration *59 (it had not theretofore issued the 361 shares to Cumberland in accordance with the two prior agreements of September 24, 1960 and March 24, 1961), and to pay $10,000 cash to Isidor. The $10,000 paid to Isidor was apparently credited against the amount owing to him by Jaffe Steel ($10,865.16), thereby reducing that debt to $865.16. The debt of Jaffe Steel to Union Bank, guaranteed by petitioners, was never paid, and the bank satisfied its claim from petitioners' passbooks which had been pledged to secure the debt. The parties hereto are in agreement that petitioners sustained allowable losses in 1962 as follows: Samuel
Isidor
Loans to Jaffe Steel
$16,018.13
$ 865.16
Guaranteed loan from
Union Bank
17,000.00
22,000.00
Capital loss on invest-
ment in Cumberland
500.00
500.00
$33,518.13
$23,365.16
After May, 1961, neither petitioner was employed by Jaffe Steel or by any of the corporations controlled by Baruch-Foster. Isidor was then about 72 years old, and was not thereafter employed by anyone. He made a number of attempts to find other employment but was unsuccessful because of his age. On May 23, 1961, Samuel was employed by Gary Steel Company at $400 a week plus expenses and an automobile. There *60 was an understanding that he would be able to buy a 30 percent interest in the company out of bonuses. His employment with that company was terminated on July 28, 1961, when he was told that the 30 percent interest would not be available to him and it was suggested that it would be to "mutual advantage" if he left. After leaving Gary, Samuel was unsuccessful in attempts to find another job. The firms from which he sought employment feared that he would be only a short-term employee because of his history of self-employment, and that he would take good will with him when he left. However, sometime in 1961, Samuel activated International Steel and Pipe Co., a corporation which he had formed in 1956 but which had been inactive since that time. Through this corporation he engaged in business similar to that of Jaffe Steel, importing and selling steel materials at wholesale. This corporation was ultimately unsuccessful; it continued in business until sometime in 1965. Samuel Jaffe was for all practical purposes unemployable because of his past history of having been self-employed for an extended period of time, and because of his personality, which did not lend itself to his serving as *61 an employee for a company other than his own. Petitioners were salaried employees of Jaffe Steel; they were in the trade or business of rendering services for compensation. At the time they made advances to and guaranteed obligations of Jaffe Steel, they realized that, if the corporation were to discontinue operations, they would lose their positions as employees and would have a difficult time finding reemployment, Isidor because of his age and Samuel because of his personality. When they made the advances and guaranties, they reasonably believed that if they did not do so the corporation would fail, and were motivated by a desire to protect their trade or business as employees. In their respective income tax returns for 1962 petitioners claimed business bad debt deductions as follows: Samuel
Isidor
$40,468.33
$22,476.67 No deduction was claimed in the returns of any of the petitioners for any of the years 1959-1962 in respect of any loss of investment or worthless stock in Jaffe Steel or loss on sale or exchange of stock in Jaffe Steel. The foregoing claimed business bad debt deductions resulted in net losses on the 1962 returns, which served as a basis for applications for tentative *62 carryback adjustments to the year 1959. Such adjustments were tentatively allowed in the amount of $8,867.82 in the case of Isidor and his wife and in the amount of $12,425.27 in the case of Samuel and his wife. In determining the 1959 deficiencies herein the Commissioner determined that the losses (substantiated in the amounts of $33,518.13 for Samuel and $23,365.16 for Isidor) were not business bad debts, as claimed by petitioners, and therefore could not form the basis for the carryback adjustments to 1959. Opinion RAUM, Judge: The parties are in agreement that petitioners sustained the following losses in 1962: Samuel
Isidor
Direct loans by petitioners
to Jaffe Steel
$16,018.13
$ 865.16
Loans by Union Bank to
Jaffe Steel guaranteed by
petitioners
17,000.00
22,000.00
Capital loss in investment
in Cumberland
500.00
500.00
$33,518.13
$23,365.16 Apart from the Cumberland loss - which will be dealt with separately hereinafter -, there is no dispute that these are losses from worthless debts within section 166 of the 1954 Code. [4] The only issue is whether the debts were "nonbusiness" debts, as contended by the Government, so that the losses arising therefrom must be treated as short term capital losses, *63 the deductibility of which is limited by sections 1211 and 1212 of the Code. Petitioners argue that these were "business" debts, created in connection with their trade or business of rendering services to Jaffe Steel for compensation. It must be remembered at the outset that there is a distinct *64 difference between the business of a stockholder and that of his corporation, and that the mere fact that the stockholder furnishes services to his corporation is not sufficient justification for treating his loans to the corporation or expenses incurred in its behalf as relating to his business. Whipple v. Commissioner, 373 U.S. 193; Deputy v. du Pont, 308 U.S. 488; Burnet v. Clark, 287 U.S. 410; Dalton v. Bowers, 287 U.S. 404. These cases and their many progeny make clear that where such loans are made or expenses incurred merely in connection with or for the purpose of protecting the stockholder's investment in his corporation they may not be regarded as "business" loans or expenses of the stockholder. But it is now equally clear that being an employee of the corporation may itself constitute a trade or business, so that if the stockholder-employee's loan to his corporation is made in order to protect his job or is otherwise proximately related thereto, the resulting debt is not a "nonbusiness" debt within section 166(d). Trent v. Commissioner, 291 F. 2d 669 (C.A. 2), reversing 34 T.C. 910; cf. Weddle v. Commissioner, 325 F. 2d 849, 851 (C.A. 2), affirming 39 T.C. 493, 496; *65 Kelly v. Patterson, 331 F. 2d 753, 756 (C.A. 5); I. Hal Millsap, Jr., 46 T.C. 751, 758. The Government does not dispute that petitioners were in the trade or business of being employees; it argues merely that the loans and guarantees did not bear the requisite relation to that trade or business. Whether there was such proximate relationship depends entirely upon the facts, and as we evaluate the evidence, we find that the loans were made and guarantees given by petitioners in order to protect their jobs. The evidence is by no means one-sided, and there are materials in the record which tend to give some support to the Government's position that the losses in question resulted from petitioners' unsuccessful investment in the new steel mill. Indeed, we have included in our findings of fact many details showing petitioners' ill-fated involvement during 1960 and 1961 in the construction of the new steel mill. The difficulty, however, is that there is no clear indication in the record that their loans to Jaffe Steel in 1958 or their guarantees of Union Bank's loans to Jaffe Steel in 1959 were in any way motivated by their objectives relating to the unfortunate steel mill venture that *66 was being conducted by two other corporations, American Rolling Mills and Cumberland. And whatever conjectures we might draw from all this evidence in favor of the Government's position are more than offset by petitioners' unequivocal testimony that they made their loans to Jaffe Steel and incurred their guarantors' liability in respect of Jaffe Steel's bank loans in order to preserve their jobs with Jaffe Steel. That testimony does not stand naked before us. It is supported by the fact [that] Isidor Jaffe was then 70 years of age and virtually unemployable if he lost his job with Jaffe Steel. And the evidence further establishes that after he in fact was compelled to terminate his association with Jaffe Steel he was unable to find other employment despite numerous efforts to do so. The record indicates that he had been receiving no dividends from Jaffe Steel and that his salary from that corporation was an important part of his total income. In these circumstances we are inclined to give more favorable consideration to his self-serving testimony than it might otherwise command. The situation in respect of Samuel Jaffe is virtually as compelling in his favor. Although of employable *67 age, he was concerned about the possibility that he could not find any other suitable employment should Jaffe Steel fail. He had a long history of being self-employed (or being employed by entities which he controlled), and there was strong reason to think that his personality was such as to make it difficult, if not impossible, for him to work in an enterprise that was not subject to his control. Indeed, two witnesses, both long experienced in the steel business, testified that they would not entertain the idea of hiring him for that reason despite his experience in that field. True, he did find work with Gary Steel Company after termination of his employment with Jaffe Steel, but his relationship with that company came to an end within a few months, after it became clear that he would not be able to acquire a 30 percent interest in the business as originally contemplated. Further efforts to obtain employment from others were fruitless. Prospective employers feared that he would be only a short-term employee because of his history of self-employment and that he would take good will with him when he left. Although there is basis for the Government's suspicion that somehow or other *68 the loans in question to Jaffe Steel related to the unsuccessful new steel mill venture, we think, on balance, the evidence supports the petitioners' position that the loans and guarantees were made by them in 1958 and 1959 in connection with their trade or business of rendering services for compensation to Jaffe Steel. We so find as a fact. In the circumstances, the bad debts resulting therefrom are deductible under section 166(a) and are not to be classified as "nonbusiness" bad debts under section 166(d) subject to the limitations affecting short-term capital losses. The situation in respect of the $500 loss in Cumberland sustained by each petitioner is entirely different. The stipulation of facts describes that loss as "Capital loss on investment in Cumberland Properties." It was obviously not a bad debt loss at all, and its deductibility is subject to such limitations and restrictions as are applicable to capital losses. Petitioners have made no argument that this loss was anything other than a capital loss, and we hold that it is not deductible as a business bad debt. Decisions will be entered under Rule 50. Footnotes
1. The parties have referred to this corporation in their stipulation as "Cumberland Properties," but other documents in evidence make clear that its full name was "Cumberland Properties, Inc." ↩
2. The parties have identified this corporation in their stipulation merely as "American Rolling Mills." Elsewhere in the record its full name would appear to be "American Steel Rolling Mills, Inc." and it appears to have been organized as a California corporation. It is to be distinguished from another corporation hereinafter referred to, also known as "American Steel Rolling Mills, Inc.," which was subsequently organized as a Delaware corporation. The California corporation will be referred to hereinafter as "American Rolling Mills" and the Delaware corporation as "Rolling Mills."
3. This is the Delaware corporation referred to in footnote two, supra.↩
4. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩