Donald C. Niblock, Jr., and Marilyn Niblock v. Commissioner.
Niblock v. Commissioner
Docket No. 5839-66.
United States Tax Court
T.C. Memo 1968-260; 1968 Tax Ct. Memo LEXIS 40; 27 T.C.M. (CCH) 1381; T.C.M. (RIA) 68260; November 13, 1968, Filed. John L. Carey, Stephen A. Seall, and William A. Thorne, Elkhart, Ind., for the petitioners. James J. McGrath, for *41 the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in petitioners' income taxes for the years 1960 and 1961 in the amounts of $4,028.11 and $6,802.48, respectively. The asserted deficiencies result from respondent's disallowance of claimed deductions for business bad debt losses. Three questions are presented for decision: 1. Did losses sustained in 1963 by petitioner which resulted from his payment of guarantees on obligations of his corporate employer constitute business bad debts? 2. Was a direct advance by petitioner to the corporation in 1961 an indebtedness or a contribution to capital? 3. If the direct advance was a debt, did the loss sustained by petitioner in 1963 constitute a business bad debt? Findings of Fact Some of the facts have been stipulated by the parties. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Donald C. and Marilyn Niblock, husband and wife, were legal residents of Elkhart, Indiana, at the time they filed their petition in this proceeding. Their joint Federal income tax returns for the years 1960, 1961, 1963 and *42 1964 were filed with the district director of internal revenue at Indianapolis, Indiana. 1382 Donald C. Niblock, Jr. (herein called petitioner), began his business career as an employee of Niblock Nash Sales, Inc., a family owned business which had been started by his father. Petitioner was its vice president and a stockholder. Petitioner, unable to agree with his father over business policy, sold his stock in the corporation and resigned his position. Subsequently, petitioner and Merlin Alson (herein called Alson) formed Niblock Flying Service, Inc., in which petitioner was a 50 percent shareholder and a salaried employee. He eventually sold his interest in this corporation to Alson and purchased Hart Metal, Inc., which he operated under the name of Hart Mobile Homes Corporation. He was both a stockholder and an employee of that corporation. In 1960 petitioner sold his stock in Hart Mobile Homes Corporation. In conjunction with the sale, he entered into an employment contract with the purchasers whereby he was to serve as president of the corporation for a period of five years. Petitioner discovered, after only 8 to 9 months, that he could not work for anyone other than himself *43 or businesses in which he had a substantial proprietary interest. Consequently, he negotiated a termination of the employment agreement with Hart Mobile Homes Corporation. On or about October 10, 1961, petitioner and Alson organized Aero-Marine Development Corporation (herein sometimes called Aero-Marine or the corporation) under the laws of the State of Indiana. The capital stock of Aero-Marine was owned 50 percent by petitioner and 50 percent by Alson. They each contributed $2,500 in exchange for his stock. Aero-Marine initially engaged in the business of selling low-priced private airplanes and later began the manufacture and sale of small fiberglass boats. At the time the corporation was organized, it was petitioner's belief, based on his previous experience with Niblock Flying Service which also had engaged in the business of selling small private airplanes, that the initial capital investment of $5,000 would be sufficient to operate the business as contemplated by the parties. A large amount of capital was not required since the business was going to finance its inventory by floorplan financing from banks and finance companies. Petitioner was an officer and employee of Aero-Marine *44 from the date of its incorporation until his resignation on August 26, 1963. During the entire period he rendered services to the corporation for compensation. For the period from October 25 to December 31, 1961, Aero-Marine sustained operating losses in the amount of $17,439.13. As a result of these losses, it had to borrow approximately $60,000 from the First Old State Bank of Elkhart in order to defray the operating expenses necessary to remain in business. In 1961 petitioner and Alson were guarantors on the loan. In August 1963 the petitioner and Alson were guarantors on the loan. In August 1963 the petitioner and Alson were guarantors of Aero-Marine's obligations in the respective amounts of $48,000 and $21,000. Petitioner was 45 and 47 years of age in 1961 and 1963, respectively. For the 9 1/2 week period in 1961 following the incorporation of Aero-Marine to the end of the year, petitioner received a salary of $1,650. In the year 1962 his salary was $8,675. In 1963 his salary from the first of the year until he left his job with the corporation in August was $5,950. Petitioner was paid at the weekly rate of $150, or $7,800 annually. At some time between the date of Aero-Marine's *45 incorporation and the end of 1961, petitioner contributed his personal airplane, which had a fair market value of about $16,000, to Aero-Marine in exchange for a demand promissory note bearing interest at the rate of 6 percent per annum. It was understood that the corporation was to sell the plane, keep the profits and return the balance of the proceeds to petitioner. However, after selling the airplane for $16,408.13, the corporation did not return anything to petitioner, but retained all the proceeds to pay off its creditors. In addition to this particular advance to the corporation, petitioner and Alson also made other advances. Although petitioner and Alson were each 50 percent stockholders, their respective advances were not made in proportion to their stockholdings. In August 1963 petitioner's advances to the corporation totaled $16,408.13 while the advances from Alson amounted to only $3,215.77. The disparity in the amounts advanced had no bearing on their equity participation in the corporation, i.e., the fact that petitioner's advances were greater than Alson's did not result in an increase in petitioner's voting power or change his proportionate equity interest. 1383
*46 As reflected by Aero-Marine's Federal corporate income tax return for 1962, the total amount of the shareholders' loans had been reduced by approximately $15,000. The loans from shareholders' accounts as of December 31, 1961, were $37,354.82, and as of December 31, 1962, were $22,015.15. In January 1963 First Old State Bank demanded payment of its loan. Because Aero-Marine was financially unable to repay the loan, petitioner was required to give First Old State Bank his personal note in the amount of $20,000 and to guarantee a loan in the amount of $29,000 from the First National Bank of Elkhart to Aero-Marine, which along with $1,000 in cash went to the First Old State Bank to discharge the balance of the loan to it. The operating history of Aero-Marine shows a net operating loss for 1961 in the amount of $17,439.13; taxable income for 1962 before deduction for its net operating loss carryforward from 1961 of $8,028.97; and a net operating loss in 1963 of $71,605.99. In the early part of 1963 a dispute between petitioner and Alson arose as to whether Aero-Marine should expand or contract its airplane operations. During this same period of time, Aero-Marine sustained substantial *47 operating losses and was on the brink of bankruptcy. As a result of the dispute and the precarious financial condition of the corporation, petitioner and Alson entered into an agreement which provided that Alson would continue the airplane operations of Aero-Marine and petitioner would relinquish his interest in Aero-Marine and would receive the assets related to the manufacture of boats. In exchange for the boat-manufacturing assets, valued at $4,280, petitioner, among other things, was required (1) to cancel any claim which he may have against the corporation through subrogation by reason of his paying the corporation's obligations of $20,000 to the First Old State Bank, (2) to pay the First National Bank $28,000 to discharge Aero-Marine's obligation which he had guaranteed, and (3) to cancel the obligation arising from the direct advance of his airplane to the corporation. On August 26, 1963, petitioner resigned his job with Aero-Marine, which is still in existence. In September 1963, petitioner incorporated Surf-Rider, Inc. In 1964 he sold 50 percent of the stock of Surf-Rider, Inc., for $20,000. In 1966 petitioner was employed and reported an income of $31,621.99. Prior *48 to the agreement, any claims which the petitioner might have had against the corporation by reason of his paying the loans he guaranteed or the direct advance were worthless by virtue of the corporation's financial inability to pay them. The claims became worthless in 1963. In October 1963 petitioner paid the $28,000 to the First National Bank. In all, the petitioner paid a total of $48,000 to discharge corporate obligations which he had personally guaranteed. In 1963 petitioner sustained a loss of $48,000 by paying off the loans which had been made to Aero-Marine by First Old State Bank and First National Bank upon his personal guarantee. He reduced his losses on the guarantees by $4,280 which was the value of the assets received by him from Aero-Marine. The net loss sustained by petitioner as guarantor of the corporate obligations was $43,720. In addition, petitioner also sustained in 1963 a loss of $16,408.13 resulting from the advance in that amount becoming worthless because Aero-Marine was unable to repay it. On his 1963 Federal income tax return petitioner claimed $43,720 as an ordinary loss from discharge of his guarantees of Aero-Marine's obligations and reported the *49 loss from the worthlessness of the direct advance of $16,408.13 as a capital loss. Petitioner filed applications for tentative carryback adjustments with the Internal Revenue Service on January 21, 1964, and on March 19, 1965, to carryback his net operating losses for 1963 and 1964 to 1960 and 1961. The Internal Revenue Service granted the applications and issued refund checks to petitioner. In his notice of deficiency dated September 26, 1966, respondent determined that petitioner's loss in the amount of $43,720 was a capital loss rather than an ordinary loss. Accordingly, respondent determined that the tentative carryback adjustments were erroneously allowed, thus resulting in the deficiencies determined for the years 1960 and 1961. Petitioner amended his petition to claim the direct advance of $16,408.13 as an ordinary loss. Opinion Respondent admits that petitioner was engaged in the trade or business of being an employee and that he sustained a net loss in 1963 in the amount of $43,720 by paying the corporate loans which he had guaranteed. The only question with respect 1384 to this loss is whether it constitutes a business or nonbusiness bad debt under section 166, Internal Revenue Code *50 of 1954.[1]Section 1.166-5(b)(2), Income Tax Regs., provides that for tax purposes the character of a bad debt must be determined by the relationship which the debt bears to the taxpayer's trade or business. If the debt bears a proximate relationship to a trade or business, it qualifies as a business bad debt. It has been held that a debt which is created to protect the taxpayer's job is proximately related to his trade or business of being an employee. Trent v. Commissioner, 291 F. 2d 669 (C.A. 2, 1961), reversing 34 T.C. 910 (1960). Petitioner claims that under section 166(a)(1)[2] of the Code and section 1.166-5(b)(2), Income Tax Regs., the loss suffered by him in paying the guaranteed loans is deductible as a business loss because his "dominant motive" in guaranteeing the loans was to protect his trade or business of being an employee of Aero-Marine. *51 Respondent contends that the petitioner has failed to establish the required proximate relationship between the loss and his trade or business. The loss, he argues, is a nonbusiness bad debt within the meaning of section 166(d), [3] deductible only as a capital loss subject to the limitations of sections 1211 and 1212. The governing principles in this type of case are clearly and succinctly stated in Isador Jaffe, 26 T.C.M. 1063. *52 1068. as follows: It must be remembered at the outset that there is a distinct difference between the business of a stockholder and that of his corporation, and that the mere fact that the stockholder furnishes services to his corporation is not sufficient justification for treating his loans to the corporation or expenses incurred in its behalf as relating to his business. Whipple v. Commissioner, 373 U.S. 193; Deputy v. du Pont, 308 U.S. 488; Burnet v. Clark, 287U.S. 410; Dalton v. Bowers, 287 U.S. 404. These cases and their many progeny make clear that where such loans are made or expenses incurred merely in connection with or for the purpose of protecting the stockholder's investment in his corporation they may not be regarded as "business" loans or expenses of the stockholder. But it is now equally clear that being an employee of the corporation may itself constitute a trade or business, so that if the stockholder-employee's loan to his corporation is made in order to protect his job or is otherwise proximately related thereto, the resulting *53 debt is not a "nonbusiness" debt within section 166(d). Trent v. Commissioner, 291 F. 2d 669 (C.A. 2), reversing, 34 T.C. 910; cf. Weddle v. Commissioner, 325 F. 2d 849, 581 (C.A. 2), affirming 39 T.C. 493, 496; Kelly v. Patterson, 331 F. 2d 753, 756 (C.A. 5); I. Hal Millsap, Jr., 46 T.C. 751, 758. In Whipple v. Commissioner, 373 U.S. 193 (1963), the Supreme Court denied the deduction to a creditor-stockholder, who was also an unsalaried employee, of the debtor on the ground that the giving of the guaranty was proximately related to the taxpayer's status as an investor. In so doing, the Court flatly rejected the claim "that where a taxpayer furnishes regular services to one or many corporations, an independent trade or business has been shown." See 373 U.S. at p. 202. It further stated that: Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising *54 from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business. * * * 1385 Absent substantial additional evidence, furnishing management and other services to corporations for a reward not different from that flowing to an investor in those corporations is not a trade or business * * *. Having disposed of the case before it, the Supreme Court also said that, since the taxpayer was unsalaried, there was no need to "consider those cases which hold that working as a corporate executive for a salary may be a trade or business. E. g., Trent v. Commissioner, 291, F. 2d 669 (C.A. Cir.)." See 373 U.S. at p. 204. In addition, it referred to the fact that even if the taxpayer had collected a salary, "there is no proof (which might be difficult to furnish where the taxpayer is the sole or dominant stockholder) that the loan was necessary to keep his job or was otherwise proximately related to maintaining his trade or business as an employee. Compare Trent v. Commissioner, supra." [Emphasis added.] Thus the entire thrust of the Supreme Court's opinion is in terms of an objective test of proximate relationship. *55 In our view its references, by way of dicta, to salaried employees were not intended to carve out a special class of taxpayer who needed only to convince this Court of his subjective intent. Where, as here, a guarantor, who is a majority stockholder-employee, asserts that he is entitled to a business bad debt deduction but fails to show unusual or extraordinary circumstances, such as those present in Isidor Jaffe, supra, the respondent should prevail. Cf. I. Hal Millsap, Jr., 46 T.C. 751 (1966), affd., 387 F. 2d 420 (C.A. 8, 1968). Although there is some support in this record for petitioner's position, we are inclined to agree with respondent for the reasons stated herein. One manifestation of petitioner's reason for guaranteeing the corporate loans is found in the agreement of August 22, 1963, which states, in part, as follows: Whereas, in financing the Corporation's obligations, the said Stockholders have heretofore given, with their respective spouses, personal guarantees of the obligations of the Corporation to the First Old State Bank *56 of Elkhart and the First National Bank of Elkhart, which personal guarantees required the said Stockholders and guarantors, upon demand, to pay any indebtedness of the Corporation which said Corporation might incur to said banks. [Emphasis added.] This statement was adopted by the petitioner subsequent to all his guarantees and yet there is no mention of an intent to preserve his employment. In fact, the clear inplication is that the guarantees were part of an investment requirement necessitated by the financing sources. Unlike the cases of Philip W. Fitzpatrick T.C. Memo. 1967-1, and Isidor Jaffe, supra, heavily relied on by the petitioner, this petitioner was not forced out of his job by the dissolution of Aero-Marine. Moreover, a highly probative consideration in both Fitzpatrick and Jaffe was the personal insecurity arising from probable unemployability in the future. In both cases the probable unemployment became a reality. Here the petitioner has shown no unusual disability which would have made him insecure about future employment. He was only 45 and 47 years of age at the times of the guarantees. He resigned voluntarily on August 26, 1963, from Aero-Marine, which is still *57 in business. By September 1963, he had already organized a new corporation, Surf-Rider, Inc., which showed enough financial promise for someone to buy 50 percent of the stock for $20,000 in 1964. Finally, the petitioner was employed in 1966 and reported $31,621.99 in income from various sources. Petitioner's recurring theme is that his personality prevented him from working as an ordinary employee. In this respect petitioner again relies on Isidor Jaffe, supra. Although in Jaffe this Court did find that the taxpayer had such a personality that would make his future employment problematical, we were assisted in making this determination by the testimony of two prospective employers, who testified that because of the petitioner's personality they would not consider hiring him. In this case, by contrast, there is only the petitioner's uncorroborated testimony concerning his personal aversion to being an ordinary employee. In addition, we observed that his demeanor while testifying did not suggest an intractable personality. Petitioner cites Lundgren v. Commissioner, 376 F. 2d 623 (C.A. 9, 1967), as holding that a business needs financing to exist, that *58 a business must exist to provide a job, and therefore that an employee must finance the business to provide this job. If this argument were accepted, every investor-employee would be entitled to business bad debt treatment whenever he made advances to his corporation. However, the Lundgren decision does 1386 not support such a general rule. The Court in Lundgren rejected the Commissioner's argument that the taxpayer should not be accorded business bad debt treatment as to his losses because his activities in relation to the corporation were, as in Whipple, no more than those of an investor seeking a return on his investment. Moreover, it was found as a fact that petitioner had never sold his stock in any of the corporations he had formed. Petitioner also cites Lundgren as an example of where the Court found no investment motivation and yet allowed business bad debt treatment. In Lundgren, the important finding that the petitioner did not have an investment motive in advancing money to the corporation was the result of a stipulation by the parties in the Tax Court proceeding. Here there is no such stipulation. We think the record herein supports the conclusion that the guarantees *59 were given primarily to protect petitioner's investment. See Gross v. Commissioner, 401 F. 2d 600 (C.A. 9, 1968). We note his profitable sale of his interest in Hart Mobile Homes, thereby giving up the exact type of self-employment which he now asserts was his aim in forming Aero-Marine. We also note that petitioner, after leaving Aero-Marine in August 1963, formed Surf Rider in September 1963 and shortly thereafter sold 50 percent of the stock. Petitioner thus relinquished again, as he had done earlier with Hart Mobile Homes, his opportunity to be in complete control of his own business. Petitioner's actions with respect to Hart Mobile Homes, Aero-Marine and Surf Rider indicate to us that he was not so much seeking independent employment and secure salary as he was casting about for investment opportunities with only incidental benefit accruing from a salary. In the case of a closely held corporation, such as Aero-Marine, we attach little significance to evidence that the giving of a guaranty of the corporate indebtedness by a principal stockholder-employee was a condition of continued employment. On this issue we hold that petitioner's guarantees of the corporate *60 obligations were not proximately related to his trade or business of being an employee and, therefore, were nonbusiness bad debts. Next we turn to the question of whether the direct advance of the airplane constituted an indebtedness or a contribution to capital. This, too, is a factual question to be determined from all the facts and circumstances of the particular case. C. M. Gooch Lumber Sales Co., 49 T.C. 649 (1968), on appeal (C.A. 6, June 24, 1968). A key factor in making such a determination is whether "there was a reasonable expectation of repayment in light of the economic realities of the situation." C. M. Gooch Lumber Sales Co., supra at p. 656. The evidence shows that petitioner transferred the asset to Aero-Marine in exchange for a demand promissory note with the expectation that the note would be repaid. The note contained the attributes of a conventional debt instrument, and the personal advance was reflected on the pro forma balance sheet of Aero-Marine's Federal corporate income tax return under "Stockholders' loans." These are indicative of *61 the objective intent of the parties that the advance was to be treated as a loan. In addition, we note that personal advances by petitioner and Alson were not made in proportion to their stockholdings. This is another indication that the parties intended the advance to be a loan. Leach Corporation, 30 T.C. 563 (1958). Petitioner and Alson each owned 50 percent of the stock of the corporation, but the petitioner's advances to the corporation were always greater than those made by Alson. For example, in August 1963, petitioner's advances to the corporation totaled $16,408.13 and Alson's were only $3,215.77. Despite the disparity, the voting power and the proportional equity interest remained equal in all respects. Lundgren v. Commissioner, supra at p. 626. Another important fact is that the corporation had repaid approximately $15,000 to the stockholders, petitioner and Alson, on their advances during the year 1962. Such partial and intermittent repayments are indicative of the existence of a reasonable expectation of repayment. C. M. Gooch Lumber Sales Co., supra. Respondent contends that the advance was a capital contribution because *62 the proceeds from the sale of the airplane were used to meet the pressing demands of creditors. Disbursement of the proceeds in this manner, he claims, demonstrates a chronic lack of working capital. We disagree. It is doubtful whether Aero-Marine's 1387 capitalization was inadequate. When the corporation was formed there was nothing to indicate that it was inadequately capitalized for the type of business it expected to conduct. Petitioner had previously operated an enterprise of a similar nature, i.e., Niblock Flying Service, Inc. He reasonably thought, at that time, that Aero-Marine was adequately capitalized since it intended to use floor-plan financing to finance its inventory. We cannot at this date, by using the 20-20 vision of hindsight, second guess petitioner. As was said in Gooch, "we ought not, in the absence of compelling reasons, substitute our business judgment for that of the taxpayer." We see no compelling reason to do so in this case. Accordingly, we hold that the advance constituted an indebtedness. Finally, our reasons and conclusion with respect to the guarantees apply with equal force to the direct loan. Petitioner has failed to establish the necessary proximate *63 relationship between the transfer of his airplane and his trade or business of being an employee of Aero-Marine. The agreement to allow Aero-Marine to retain the profit on the sale of the airplane tends to show an attempt to enhance the general business of the corporation and thus his investment. Therefore, we conclude that the direct loan was a nonbusiness bad debt. Decision will be entered under Rule 50. Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year.↩
3. SEC. 166. BAD DEBTS. (d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩