Ida Rosati, surviving wife of James Rosati,sr., deceased and Ida Rosati, individually v. Commissioner.
Rosati v. Commissioner
Docket No. 1292-68.
United States Tax Court
T.C. Memo 1970-343; 1970 Tax Ct. Memo LEXIS 17; 29 T.C.M. (CCH) 1661; T.C.M. (RIA) 70343; December 17, 1970, Filed *17 In order to secure the release of a Federal tax lien upon the assets of a corporation, petitioner's husband, who was president and director and held at least 64 percent of the corporation's stock, executed a guaranty for payment of the taxes. Petitioner and her husband also mortgaged to the United States real estate owned individually by them to further secure payment of taxes. Upon default by the corporate principal obligor, petitioner and her husband transferred to the United States by deed all of their interest in the property previously mortgaged to the United States. Held, the loss sustained upon the transfer of the property was a business bad debt loss. Anthony S. Battaglia and Howard P. Ross, 3835 Central Ave., P.O. Box 12078, St. Petersburg, Fla., for the petitioners. Frank B. Metcalf, for the respondent. WITHEY
*18 Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner determined deficiencies of $22,096.78 and $3,578.52 in petitioners' income taxes for the taxable years 1962 and 1963, respectively. The sole question to be decided is whether petitioners are entitled to net operating loss deductions for the years 1962 and 1963 as a result of net operating loss carrybacks from the year 1965. 1662 Findings of Fact *19 The parties have stipulated certain facts which are accordingly found as fact. The petitioners herein are Ida Rosati, individually, and Ida Rosati as surviving wife of James Rosati, Sr., deceased. At the time of filing the petition herein, Ida Rosati resided at St. Petersburg, Florida. James Rosati, Sr., died on October 15, 1967, and at the time of trial, no representative had been appointed for his estate. Until James' death, he and Ida were at all times relevant herein husband and wife. They filed joint income tax returns for their taxable years 1962 through 1965 with the district director of internal revenue at Jacksonville, Florida. James was president and director and held at least 64 percent of the capital stock of Orange Lake Homes, Inc. (hereinafter referred to as the corporation), from its inception in 1955 until January 3, 1964, when his stock was redeemed. The corporation was solely engaged in the construction of homes and related improvements such as streets, water lines, and sewers. The corporation borrowed approximately 90 percent of its capital needed for land development *20 from First Federal Savings and Loan Association of St. Petersburg, Florida. As security for these loans, First Federal required petitioners' personal guaranty as well as a first mortgage on the property purchased and developed through the use of the borrowed funds. Homes completed and held for sale by the corporation were, therefore, subject to a first mortgage. The homes were sold under contracts of deed under which instrument the title to the property remained in the corporation until the unpaid balance on the first mortgage was equal to the unpaid balance on the contract for deed. Under this arrangement, the corporation made the payments on the first mortgage to First Federal while the purchaser made payments on the contract for deed to the corporation, the latter payments including interest at a rate one-hald percent greater than the interest rate on the first mortgage. When the balances due on the first mortgage and the contract for deed were equal, Orange Lake Homes, Inc., would transfer the deed to the purchaser who would then assume the first mortgage. Through experience, the corporation determined the contracts for deed were not marketable at their remaining face value *21 at the time of any default on the part of a purchaser. Therefore, if a purchaser defaulted on a contract for deed, the corporation found it best to refurbish and resell the house rather than sell the contract for deed at a discount. Due to the unprofitable results ensuing upon a purchaser's default, the corporation ceased selling homes by means of contracts for deed after 1960. James' primary duties as corporate president were to personally guarantee repayment of the corporation's construction loans and to provide financing for and supervise all construction. Following a car-train collision in 1961, he was unable to continue to perform all these duties and thereafter functioned merely as a guarantor of the corporation's loans, for which function he was compensated by salary. In 1962 and 1963, James reported $39,310 and $26,470, respectively, as wages received from Orange Lake Homes, Inc. The following is a list of loan transactions between the corporation and First Federal, all of which were secured by first mortgages as outlined above and all of which were executed by James, both in his capacity as president and in his individual capacity: Date
Amount of Loan
10/ 1/55
$188,200
11/ 9/55
196,200
4/25/57
5,300
1/ 6/59
6,600
6/ 8/59
7,600
9/ 3/59
7,200
11/18/59
6,800
11/ 3/61
4,700
11/15/61
8,000
11/16/61
9,600
10/15/62
202,000
*22 After James' accident, one of his sons, Joseph, who was vice president of the corporation, acquired a power of attorney from his father to help manage his father's affairs. The following is a list of loan transactions between the corporation and First Federal, all of which were secured by first mortgages and all of which were executed by Joseph Rosati in his capacity as vice president of Orange Lake Homes, Inc., and as attorney-in-fact for his father: Date
Amount of Loan
1/15/62
$ 9,600
2/20/62
7,000
4/18/62
13,500
10/ 2/63
12,150
5/ 7/63
12,100
3/14/63
1,040
8/28/63
12,600
12/16/63
12,500
12/16/63
12,500
12/16/63
13,400 1663 On August 6, 1962, respondent made the following assessments of corporate income tax against Orange Lake Homes, Inc.: Fiscal year ended
Amount
4/30/57
$106,106.37
4/30/58 269,633.56
Total
$375,739.93 On September 5, 1962, respondent filed in the public records of Pinellas County, Florida, notice of Federal tax lien regarding the assessments against Orange Lake Homes, Inc. In order to secure a release of the Federal tax lien to enable the corporation to resume operations, the following arrangements *23 were made with respondent: (1) Orange Lake Homes, Inc., prepared a plan to liquidate the assessment, which plan provided for an immediate payment of $123,000. (2) James Rosati, Sr., as surety, and Orange Lake Homes, Inc., as principal, executed a bond for release of Federal tax liens for the balance of the assessments. (3) James Rosati, Sr., and his wife mortgaged to the United States real estate owned individually by them and worth approximately $300,000 to secure the payment of the bond. The lien was released by respondent on October 15, 1962. On January 3, 1964, the corporation redeemed all of its stock held by James Rosati in exchange for contracts for deed with an agreed estimated value of $150,000 [1] (face value of $199,000), plus $10,000 in cash, or a total consideration of $160,000. James placed the contracts for deed in a trust with himself as beneficiary. The trust reported net operating losses of $2,960.71 and $11,931.49 for the taxable years 1964 and 1965, respectively. *24 The corporation defaulted in 1965 on its obligation to liquidate the assessment and ceased conducting further business in March or April of that year. On May 14, 1965, as consideration for James' release from his obligations under the bond, James and Ida transferred to the United States by deed, all of their interest in the property previously mortgaged to the United States. Their cost basis in the property transferred was $130,789.40. On the date the property was transferred, the outstanding balance of the assessments was $75,639.25. On July 19, 1965, respondent sold the property conveyed by petitioners for $27,000, less selling expenses. [2] The net amount realized on the sale, $26,837.62, was applied against the balance remaining on the assessment. James and Ida claimed the amount of their basis in their property conveyed to respondent as a loss and on August 11, 1966, filed an amended income tax return for the year 1965, reporting a net operating loss for that year in the amount of $117,675.63. *25 They then claimed net operating loss deductions for their taxable years 1962 and 1963 as a result of carrying back the loss in 1965 and filed a claim for refund of the income taxes paid in 1962 and 1963. This claim was tentatively allowed. Respondent subsequently determined petitioners were not entitled to the net operating loss deductions and determined a deficiency in their income taxes for 1962 and 1963, which determination has given rise to the dispute herein. Ultimate Finding of Fact The loss incurred by petitioners upon transferring their property to the United States was proximately related to James' trade or business. Opinion James and Ida realized a loss on May 14, 1965, when they transferred their mortgaged property to the United States. The loss is deductible as a bad debt loss under section 166, [3] see Robert E. Gillespie, 54 T.C. 1025, 1031 (1970), or not at all, 1663 Putnam v. Commissioner, 352 U.S. 82 (1956). Therefore, we do not reach petitioners' alternate contentions that the loss is deductible under section 165(c)(1) and (2). [4]
*26 The controversy herein arose as a result of respondent disallowing petitioners' net operating loss deductions in the taxable years 1962 and 1963. In order for petitioners to prevail in claiming these net operating loss deductions, they must prove the loss was a business bad debt. [5]
*27 Under the facts in this case, whether the loss was a business or nonbusiness bad debt turns upon whether the debt was created or acquired in connection with James' trade or business. [6] In order to prevail on this issue, petitioners must show that James was engaged in a trade or business and that the debt was proximately related to this trade or business. Whipple v. Commissioner, 373 U.S. 193 (1963). It is now well settled that employment as a corporate executive constitutes a "trade or business" within the meaning of sections 166 and 172(d)(4) of the Code. Roberts v. Commissioner, 258 F. 2d 634 (C.A. 5, 1958), affirming a Memorandum Opinion of this Court (construing the predecessor to section 172 (d)(4)). Therefore, our only inquiry is whether the loss was proximately related to James' trade or business of being an executive of Orange Lake Homes, Inc. In order to answer that question, it is necessary to determine whether James, acting as guarantor, was sufficiently motivated by a desire to protect his trade or business of being president of Orange Lake Homes, Inc. In United States v. Generes, 427 F. 2d 279 *28 (C.A. 5, 1970), the Court of Appeals for the Fifth Circuit has recently joined the Court of Appeals for the Second Circuit in Weddle v. Commissioner, 325 F. 2d 849 (C.A. 2, 1963), affirming 39 T.C. 493 (1962), in using the significant motivation test in determining whether the taxpayer's advances were so proximately business related as to constitute business bad debts. This Court has in fact in Weddle v. Commissioner, supra, and has very recently in Oddee Smith, 55 T.C. - (1970), indicated its adherence to the primary motivation test and we accordingly apply that test here. James and Ida mortgaged real property worth approximately $300,000 to secure the release of the Federal tax lien and enable the corporation to continue operating. James received salaries from the corporation of $39,310 and $26,470 for the years 1962 and 1963. His stock was redeemed on January 3, 1964, approximately 13 months after executing the mortgage to respondent, at which time he received contracts for deed with an estimated value of $150,000 (face value of $199,000) and $10,000 cash, or a total consideration upon redemption of $160,000. Respondent argues "the disparity *29 involved [between the value of the property mortgaged ($300,000) and the consideration received upon redemption ($160,000)] indicates that his salary was not a 'significant' 1665motivation for executing the guaranty, much less his 'primary' motivation." We think the facts indicate the contrary. It is inconceivable to us that petitioner would risk assets worth $300,000 to protect an investment worth only $160,000. As we view the facts, the disparity indicates that James was primarily motivated to preserve his job and salary when he executed the guaranty. Accordingly, we hold the debt was proximately related to James' trade or business of providing the financing for the operation of Orange Lake Homes, Inc., and is therefore a business bad debt. Decision will be entered under Rule 50. Footnotes
1. For the purpose of determining the amount realized upon redemption to be reported on their 1965 joint income tax return, James, Ida, and respondent estimated that the contracts were worth 75 percent of face value. For want of further reliable evidence on this point, we accept that estimate for our purposes herein.↩
2. The record is devoid of evidence explaining the reason for the discrepancy between the value of the property when mortgaged (approximately $300,000) and the $27,000 selling price.↩
3. All section references are to the Internal Revenue Code of 1954, as amended. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * * (d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsection (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. ↩
4. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business * * *↩
5. SEC. 172. NET OPERATING LOSS DEDUCTION. (a) Deduction Allowed. - There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. For purposes of this subtitle, the term "net operating loss deduction" means the deduction allowed by this subsection. * * * (c) Net Operating Loss Defined. - For purposes of this section, the term "net operating loss" means (for any taxable year ending after December 31, 1953) the excess of the deductions allowed by this chapter over the gross income. Such excess shall be computed with the modifications specified in subsection (d). (d) Modifications. - The modifications referred to in this section are as follows: * * * (4) Nonbusiness deductions of taxpayers other than corporations. - In the case of a taxpayer other than a corporation, the deductions allowable by this chapter which are not attributable to a taxpayer's trade or business shall be allowed only to the extent of the amount of the gross income not derived from such trade or business * * * [Emphasis supplied.]↩
6. Sec. 166(d)(2)(A), supra.↩