Wallace L. Hirsch and Ellen F. Hirsch v. Commissioner. Wallace L. Hirsch and Doris K. Hirsch v. Commissioner.
Hirsch v. Commissioner
Docket Nos. 1988-69, 1993-69.
United States Tax Court
T.C. Memo 1971-235; 1971 Tax Ct. Memo LEXIS 97; 30 T.C.M. (CCH) 1008; T.C.M. (RIA) 71235; September 14, 1971, Filed. Arnold W. Hirsch and H. Louis Katz, for the petitioners. Alan E. Cobb, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioners' income tax as follows: Petitioner
Year
Deficiency
Wallace L. & Doris K. Hirsch
1965
$ 2,934.78
Wallace L. & Ellen F. Hirsch
1966
13,887.87
*98 The sole issue is whether losses in the amount of $54,999 sustained by petitioner Wallace L. Hirsch in connection with the sale of stock and the redemption of debentures were ordinary losses under sections 165 and 166, I.R.C. 1954. Findings of Fact The stipulation of facts filed by the parties, together with accompanying exhibits, are incorporated herein by this reference. Wallace L. and Doris K. Hirsch, petitioners in Docket No. 1993-69, were husband 1009 and wife at the end of 1965. They filed a joint Federal income tax return for the calendar year 1965 with the director of internal revenue. Philadelphia, Pennsylvania. They were divorced in 1966. At the time the petition and amended petition herein were filed Wallace L. Hirsch resided at 527 Delancey Street, Philadelphia, Pennsylvania, and Doris K. Hirsch resided at 204 Washington Avenue, Santa Monica, California. Wallace L. Hirsch and Ellen F. Hirsch, petitioners in Docket No. 1988-69, were married in 1966. They filed a joint Federal income tax return for the calendar year 1966 with the director of internal revenue, Philadelphia, Pennsylvania, and resided at 527 Delancey Street, Philadelphia, Pennsylvania, when their *99 petition in this case was filed. Wallace L. Hirsch ("Hirsch" or "petitioner") was born on August 26, 1920. He was graduated from the University of Pittsburgh with a bachelor's degree in 1941. His father and uncle, as partners, owned a retail furniture business in Donora, Pennsylvania, known as Donora Furniture Company. Petitioner "grew up" in that business, working there during summer vacations while at school, and upon graduation in 1941 he began to work for the company on a full-time basis. From April, 1942, to November, 1945, he served in the United States Navy. His father had meanwhile bought out his uncle's interest, and when petitioner returned from the Navy, his father formed a new partnership under the same name with his three sons (petitioner and two brothers) to carry on the same business. Petitioner's two brothers are attorneys and did not participate in the conduct of the business, apart from contributing occasional legal services and helping "with some of the book work." Upon the father's taking ill in 1951, followed by his death in 1952, petitioner assumed the full management of the business. He continued to run the company until 1961, when it was sold because of the *100 unfavorable economic outlook in Donora; employment in the only industry in the town was decreasing and the Donora plant was eventually closed completely. Petitioner was then residing in Pittsburgh and had been commuting to Donora, which was about 25 miles away. After the sale of the Donora Furniture Company petitioner went to work on a trial basis with a friend who was engaged in the direct mail advertising business in Camden, New Jersey. Petitioner was a salaried employee and made no investment in this business. During the period of this trial employment petitioner maintained his home in Pittsburgh where he owned a house. He commuted to Camden for the work-week and stayed there in a motel, returning to Pittsburgh on the weekends. While he was thus temporarily engaged in Camden, it was necessary that petitioner undergo surgery, a radical thyroidectomy, involving the removal of malignant, cancerous tumor tissue from the left lobe of his thyroid gland and related areas, including the larynx and the left shoulder. At the time of the surgery it was discovered by chest X-ray that the same type of tumor tissue was also present in both his lungs. Petitioner was advised by his physicians *101 that this tissue was a "slow growth or indolent type of tumor tissue" and that they felt it could be controlled by radio isotope treatments. Petitioner has undergone several such treatments subsequent to the surgery performed upon him in 1961. As a result of the surgery on his thyroid gland, larynx and left shoulder petitioner suffered several disabilities. For at least three weeks after the surgery he had no voice. He was advised by his surgeon that some vocal capacity would return but not the voice he had prior to the operation. Eventually, in four or five months, he was able to speak in a rasp or a whisper and he still suffers from some disability in this respect. In addition petitioner has limited mobility of his left arm and neck. Shortly after petitioner's surgery and while he was in the hospital, petitioner's employment in direct mail advertising was terminated by his employer, who felt that petitioner did not have a future in the business. Petitioner had held that temporary job five or six months when it was terminated and he also was convinced that direct mail advertising was not a field for him. Petitioner was discharged from the hospital in December, 1961. He then *102 spent some months recuperating and waiting to get back enough voice so that he could talk to people. In the spring of 1962 after his voice had returned in part petitioner, aware of his physical limitations, decided to continue to work in the home furnishing business, the field he knew best. Over a period of three to four months, he approached approximately 20 or 25 people in the Pittsburgh area seeking employment, but was unsuccessful in obtaining work. During this period petitioner had no income and supported his family, which included his wife 1010 and three children, with the proceeds he received from the sale of the Donora Furniture Company. He was running out of funds and felt his situation was "pretty desperate." His total assets had been reduced to approximately $50,000 to $60,000, which included the value of his home. While looking for employment petitioner learned that Furnapco, Inc. ("Furnapco" or the "corporation"), a recently organized New York corporation, was "seeking to expand * * * [and] that there may have been * * * a good job opportunity there * * *." Furnapco was a closely held corporation controlled by several persons named Goodman and Luria, who were related *103 to one another. It was engaged in the business of selling furniture and house furnishings at retail through "outlets" or "licensed locations" in stores owned by others. It then had outlets in two discount department stores, one in Albany, New York, and the other in Pensauken, New Jersey. Its warehouse and offices were located in Albany, New York. When petitioner first communicated with Furnapco, the corporation was seeking additional capital to increase its outlets to five. Petitioner was informed that it would be necessary for him to invest money in Furnapco in order to obtain employment, and that without such additional capital to expand its operations Furnapco would not require any additional personnel. Petitioner was willing to make the necessary "investment" in order to obtain employment because of what he regarded as his desperately deteriorating financial situation. Petitioner then entered into negotiations with Furnapco. The persons with whom he negotiated were not aware that petitioner had cancer. As a result of these negotiations it was determined that petitioner would invest $80,000 in the corporation in return for a one-third interest in the stock of Furnapco, debentures *104 of the corporation in the amount of $42,500 (which would represent one-third of the debentures then outstanding), and employment with the corporation. Petitioner's primary motivation for investing the $80,000 was to obtain such employment. In order to raise the necessary funds he had to sell his house and borrow some $15,000 from relatives. On September 7, 1962, petitioner entered into a contract of employment "as Buyer and to perform such other executive duties" with Furnapco. Under the contract petitioner was to be paid an annual salary of $18,000 a year from August 13, 1962, to July 31, 1965, and his employment was to be automatically renewed thereafter from year to year unless terminated by either party. Also on September 7, 1962, A. Richard Goodman and Robert Goodman entered into employment contracts with Furnapco as general manager and store operations manager, respectively. Under these contracts they were each to receive $20,000 annual salary. It was anticipated that petitioner's $18,000 salary when added to the interest on his $42,500 debentures would be equal to $20,000, thus providing him with the same income from the corporation that would be received by each of the Goodmans. *105 On September 17, 1962, petitioner entered into an agreement with Furnapco in which he agreed to purchase from the corporation 375 shares of Furnapco stock at $100 per share, which upon purchase would constitute one-third of Furnapco's outstanding stock, and to lend Furnapco $42,500 and take in return debentures evidencing such loan. The agreement acknowledged petitioner's contract of employment with Furnapco, and provided for the repurchase at book value by either Furnapco or A. Richard and Robert Goodman of petitioner's 375 shares in the event petitioner's employment with the corporation should be terminated. In addition article SEVENTH of the agreement provided as follows: SEVENTH: Anything hereinbefore contained to the contrary notwithstanding, if the termination of Hirsch's employment shall occur because Furnapco terminates the employment, then Hirsch shall continue to receive the compensation provided for in his employment agreement with Furnapco until such time as the purchase price of his shares of stock shall have been paid in full. Also on September 17, 1962, in a letter signed by A. Richard and Robert Goodman and accepted and approved by petitioner it was agreed that *106 either the corporation or the two Goodmans would purchase "any notes or debentures of FURNAPCO, INC.," issued to petitioner pursuant to the aforementioned agreement of the same date, if petitioner's employment with the corporation should be terminated either by reason of his death or discharge by the corporation. At the time he signed the above agreement, on September 17, 1962, petitioner was asked by Furnapco to sign two additional 1011 documents prepared by its attorneys relating to petitioner's $42,500 loan to the corporation. The first document read in part as follows: Upon receipt of the shares of stock of your Corporation by the undersigned pursuant to paragraph SECOND of the Agreement, the undersigned will deliver said shares of stock, duly endorsed in blank for transfer, together with a sum of money equal to Federal and New York State transfer taxes due on such transfer, and will also deliver his resignation as officer, director and employee of your Corporation, to Weisman, Celler, Allan, Spett & Sheinberg, Esqs., as escrowee, who shall hold the said shares of stock until the undersigned shall have loaned to the Corporation the sum of Forty-two Thousand Five Hundred Dollars *107 ($42,500) in accordance with his obligation to so do as set forth in paragraph THIRD of the Agreement. * * * Upon the making of the aforementioned loan of Forty-two Thousand Five Hundred Dollars ($42,500) by the undersigned, the escrowee shall forthwith deliver the shares of stock and resignation to the undersigned. Upon the default by the undersigned in making the said loan, or if the undersigned shall become insolvent or make an assignment for the benefit of creditors, if a petition in bankruptcy shall be filed, or in the event of the appointment of a receiver of substantially all of the undersigned's property, the escrowee shall forthwith deliver the said shares of stock held in escrow and the aforementioned resignation to you; you may thereupon proceed to sell the said shares of stock, or, at your option, may cancel the same. * * * The second document presented for petitioner's signature was the resignation referred to in the above-quoted passage. Petitioner was adamant in his refusal to sign either document because he had assured Furnapco that the loan would be forthcoming. Furnapco thereupon withdrew both instruments. In connection with the $42,500 loan, petitioner did agree *108 on October 1, 1962, to subordinate his claim under the loan to any future indebtedness for bank loans and to any present or future indebtedness to merchandise creditors as a means of improving Furnapco's credit rating. At a joint meeting of Furnapco's stockholders and the board of directors on August 13, 1962, petitioner was elected a vice-president and treasurer of the corporation. He also was to serve on the board of directors. On October 8, 1962, the corporation issued to petitioner the 375 shares of stock he had agreed to purchase under the September 17, 1962, agreement. The corporation also issued debentures to petitioner on the following dates and in the following amounts evidencing Furnapco's indebtedness to petitioner for total loans of $42,500 which he also had agreed to make to the corporation under the September 17, 1962, agreement: October 8, 1962
$ 2,500
November 8, 1962
20,000
December 7, 1962
10,000
December 10, 1962
10,000
Furnapco proceeded to expand its operations to five outlets as originally planned. The corporation was still under-capitalized for such an expansion, however, and it became necessary for it to borrow additional capital. *109 At about the same time petitioner became employed with the corporation, Furnapco obtained a $150,000 bank loan, and on June 5, 1963, petitioner lent the corporation an additional $5,000. Sometime around March, 1964, the $150,000 bank loan was called. In March, 1964, Dorothy L. Goodman, William J. Luria and Herbert B. Lauria, III - members of the related families which controlled Furnapco - acting as trustees under a trust dated April 15, 1960, borrowed $150,000 from another bank, and in turn lent this amount to Furnapco on March 16, 1964, thus enabling it to discharge the outstanding bank loan which had been called. Furnapco's obligation to repay the loan to the trustees was embodied in a demand note. Furnapco continued to experience financial difficulties, and petitioner disagreed with the Goodmans and Lurias over the management of the corporation. On June 25, 1964, petitioner was discharged as an employee of the corporation. Petitioner then brought suit in the Supreme Court of the State of New York, County of New York, against A. Richard Goodman, Robert Goodman, Julius Goodman, William Luria, Mervin Luria, Murray Spett (a director of Furnapco), Herbert Berk (secretary of Furnapco), *110 and Furnapco, Inc., praying among other things that the defendants, A. Richard Goodman, Robert Goodman, Julius Goodman and William Luria return to petitioner the sum of $85,000 together with interest from September 17, 1964. The $85,000 prayed for represented the $80,000 ($37,500 for 375 shares of Furnapco stock and $42,500 in loans to the corporation) paid into Furnapco under petitioner's 1012 agreement with the corporation dated September 17, 1962, together with the additional $5,000 loan petitioner had made thereafter to the corporation. Dorothy L. Goodman, William J. Luria and Herbert B. Luria, III, trustees, then brought suit in the Supreme Court of the State of New York, County of Albany, against Furnapco, Inc., A. Richard Goodman and petitioner demanding judgment against the defendants in the sum of $150,000, together with interest, on the promissory note issued by the corporation in respect of the loan made by the trust to Furnapco on March 16, 1964. The action brought by the trustees in connection with the $150,000 loan to Furnapco threatened to bankrupt the corporation. The petitioner therefore entered into a settlement agreement with the parties to the above-mentioned *111 suits dated August 2, 1965, wherein the petitioners agreed to sell to A. Richard Goodman his 375 shares of Furnapco stock for the sum of $1, to turn over to Furnapco the four debentures totalling $42,500 in consideration for $25,000 payable in monthly installments, and to sell to A. Richard Goodman for the sum of $5,000 the promissory note dated June 5, 1963, evidencing petitioner's $5,000 loan to Furnapco. These terms of the settlement agreement were complied with on September 18, 1965. As a result of the sale of petitioner's stock and redemption of his debentures in the amount of $42,500, petitioner sustained total losses of $54,999 in 1965. The $54,999 in losses consisted of $37,499 from the sale of his Furnapco stock (the difference between the $1 he received and his basis of $37,500) and $17,500 from the redemption of the debentures (the difference between the $25,000 he was to receive in installments and the $42,500 he lent to the corporation). On the 1965 tax return which he filed with Doris K. Hirsch petitioner treated the $54,999 (reported as $55,000 on the return) in losses from the sale of his Furnapco stock and the redemption of the debentures as ordinary losses. The *112 1966 tax return which petitioner filed with Ellen F. Hirsch reflected a $35,000 ordinary loss carryover in connection with the losses sustained by petitioner from the sale of the stock and the redemption of the debentures. In his deficiency notices the Commissioner determined that the $54,999 constituted capital losses and not ordinary losses. Opinion RAUM, Judge: The parties are in agreement that petitioner Wallace L. Hirsch sustained losses in 1965 in the total amount of $54,999, arising from the sale of 375 shares of stock in Furnapco, Inc., and from the redemption of debentures which evidenced loans he had made to that corporation. The only question in dispute involves the relationship of the purchase of the stock and the making of the loans to petitioner's "trade or business" within the meaning of sections 165 and 166, I.R.C. 1954. The Government has made several arguments that the stock and debentures were "capital assets," and that the losses arising from their disposition must be treated as capital losses, the deductibility of which is limited by sections 1211 and 1212 of the Code. Petitioners argue that the stock was purchased and the loans were made in connection with *113 Hirsch's trade or business of rendering services to Furnapco for compensation. As such, they contend that the loss incurred upon the sale of his Furnapco stock is deductible under section 165, I.R.C. 1954, [1] and the loss sustained from the redemption of the debentures is deductible under section 166, I.R.C. 1954. [2]
*114 1013 At the outset we note that the determination of whether a loss under section 165 is "incurred in a trade or business" involves a consideration of substantially the same criteria as those taken into account under section 166 in ascertaining whether a debt was "created or acquired * * * in connection with a trade or business of the taxpayer." See H. Rept. No. 2333, 77th Cong., 2d Sess., pp. 76-77; S. Rept. No. 1631, 77th Cong., 2d Sess., p. 90; cf. Trent v. Commissioner, 291 F. 2d 669, 674 (C.A. 2), reversing 34 T.C. 910. The determination under either section is whether a proximate relationship exists between the taxpayer's trade or business and the source of the loss. Compare Weddle v. Commissioner, 325 F. 2d 849, 850-853 (C.A. 2), affirming 39 T.C. 493, 496, and Whipple v. Commissioner, 373 U.S. 201, 204-205, with Steadman v. Commissioner, 424 F. 2d 1, 5-6, affirming 50 T.C. 369, 379-380. See Trent v. Commissioner, supra;, Kelly v. Patterson, 331 F. 2d 753, 756 (C.A. 5); Samuel R. Milbank, 51 T.C. 805, 816-817. [3] Moreover, the test to be applied *115 in deciding this question is one of ascertaining Hirsch's "primary motivation" in purchasing the stock and making the loans to Furnapco. Oddee Smith [Dec. 30,408], 55 T.C. 260, 270. [4] We think the record establishes that Hirsch's "primary motivation" was to obtain employment with Furnapco. We therefore conclude that the losses are deductible pursuant to the provisions of sections 165 and 166. Because of the physical limitations which he suffered as a result of surgery, Hirsch decided to seek employment in the home furnishing business in which he had been employed prior to 1961. Over a period of several months, he made numerous efforts to obtain such employment, but he was singularly unsuccessful until the negotiations with Furnapco. As a condition of employment with Furnapco he was required to purchase stock and make loans to the corporation. It was his unrefuted and convincing testimony herein that he was principally motivated to purchase the stock and make the loans because he wanted employment with Furnapco. Moreover, Hirsch's agreements *116 with the corporation and the members of the two families which controlled Furnapco are replete with suggestions that the purchase of the stock and the loans were inextricably bound up with Hirsch's employment. The September 17, 1962, agreement in which Hirsch agreed to purchase the stock and make the loans, both acknowledged Hirsch's contract of employment and provided that the shares were to be repurchased by either the corporation or A. Richard and Robert Goodman if such employment should be terminated. Moreover, in the event Hirsch's employment should be terminated by the corporation, article SEVENTH of the agreement provided that Hirsch "shall continue to receive the compensation provided for in his employment agreement with Furnapco until such time as the purchase price of his shares of stock shall have been paid in full." In the September 17, 1962, letter signed by A. Richard and Robert Goodman and accepted and approved by Hirsch, it was agreed that his debentures would similarly be repurchased if his employment should be terminated either by reason of his death or discharge by the corporation. Indeed, the interest that Hirsch was to receive on the debentures was considered in *117 determining his compensation under the contract of employment. Though petitioner did not sign the two other documents presented to him on September 17, 1962, the evidence indicates that his refusal to do so was based upon his indignation at the pressure that was being put upon him rather than upon any disagreement with the underlying thought embodied in these documents to the effect that there was a close relationship between the purchase of the stock and the loans and Hirsch's employment with Furnapco. Essentially, these documents conditioned his employment on making the $42,500 in loans which he had already promised to make to the corporation under the agreement of September 17, 1962. We therefore think that both the stock and debentures were obtained by Hirsch as an integral part of his trade or business of being a corporate executive of Furnapco, and that given the precarious financial position of the corporation and the terms of the 1014 agreements mentioned above, the stock and debentures continued to be held by him for this purpose until the time he disposed of them. See Booth Newspapers, Inc. v. United States, 303 F. 2d 916, 921 (Ct. Cl.); Steadman v. Commissionner, supra, 424 F. 2d at 5-6, *118 affirming 50 T.C. 369. The Commissioner has argued that at the time Hirsch purchased the stock and made the loans he was not engaged in the trade or business of being a corporate executive of Furnapco. We note that Hirsch's employment contract was entered into on September 7, 1962, and stated he was to be employed from August 13, 1962, while the stock purchase and loan agreement was not entered into until September 17, 1962. However, even if this were not the case, we think the record establishes that the purchase of the stock and the loans were inextricably bound up with Hirsch's employment both in the sense of their proximate relationship and as to the time these events occurred. We note also that Hirsch, though unemployed after his surgery, was actively looking for a position in the home furnishing business, in which he had been previously employed during his entire adult life, apart from his military service and the short period of time when he was employed on a trial basis in the direct mail advertising field. In these circumstances, he may well be regarded as having remained in the home furnishing business during the interval when he was seeking another connection *119 in that field. Cf. Harold Haft, 40 T.C. 2. We similarly regard without merit the Commissioner's other arguments that the losses here in question are capital losses. Decisions will be entered under Rule 50. Footnotes
1. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. -in the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business * * * ↩
2. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * * (d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
3. See also Isidor Jaffe, 26 T.C.M. 1063↩, 1068. 4. See also Ida Rosati, 29 T.C.M. 1661↩, 1664.